889 So.2d 623 (2003)
Gerrald Patrick LEWIS
v.
STATE of Alabama.
CR-99-1155.
Court of Criminal Appeals of Alabama.
May 30, 2003.
*632 Glenn L. Davidson, Mobile, for appellant.
William H. Pryor, Jr., atty. gen., and Anne C. Adams, asst. atty. gen., for appellee.
SHAW, Judge.
The appellant, Gerrald Patrick Lewis, was convicted of three counts of capital murder in connection with the murder of Misty McGugin. The murder was made capital (1) because it was committed during the course of a kidnapping in the first degree or an attempt thereof, see § 13A-5-40(a)(1), Ala.Code 1975; (2) because it was committed during the course of a robbery in the first degree or an attempt thereof, see § 13A-5-40(a)(2), Ala.Code 1975; and (3) because it was committed during the course of a rape in the first degree, a rape in the second degree, or an attempt thereof, see § 13A-5-40(a)(3), Ala.Code 1975. Lewis was also convicted of two counts of attempted murder, two counts of attempted kidnapping in the first degree, two counts of attempted rape in the first degree, and two counts of robbery in the first degree relating to Stephanie Grayson and Ashley Bitowf. The jury recommended, by a vote of 10-2, that Lewis be sentenced to death for his capital-murder convictions. The trial court accepted the jury's recommendation and sentenced Lewis to death. In addition, the trial court sentenced Lewis, as a habitual felony offender, to life imprisonment without the possibility of parole for the two attempted-murder convictions, the two attempted-kidnapping convictions, and the two robbery convictions, and to life imprisonment for the two attempted-rape convictions. Lewis's sentences were to run consecutively.
The evidence adduced at trial indicated the following. On Wednesday, February 4, 1998, 21-year-old Misty McGugin was reported missing. McGugin was last seen by her family on Friday, January 30, 1998, when she dropped off her two-year-old son to spend the weekend at her grandmother's house in Chickasaw. McGugin was scheduled to pick up her son on Monday morning, but she never did. McGugin's *633 family initially searched for McGugin themselves, but after they discovered her Ford automobile abandoned in the parking lot of the Drifter's Lounge on the causeway, they filed a missing person's report with the Baldwin County Sheriff's Department.
The State presented evidence indicating that McGugin had been employed by Abigail's Escort Service and that her "stage name" at the escort service was "Tosha." (R. 1331-32.) James Ashley Lee, the manager of Abigail's Escort Service, told investigators with the Baldwin County Sheriff's Department that he had spoken with McGugin on Saturday, January 31, 1998. Specifically, Lee told investigators that on Saturday evening he received a telephone call from a man who identified himself as "Mark Evans" and who asked for "Misty." (R. 1331.) Lee said that Mark Evans was one of McGugin's regular clients and that he often telephoned the agency for McGugin. Lee told investigators that the man who called for McGugin stated that he was at Woody's Motel in room 18 and that he wanted McGugin to come over. Lee then notified McGugin that she had a client and McGugin came to the agency, telephoned Woody's Motel, spoke with someone, and then told Lee that she would go. Lee said that McGugin went to the motel at around 9:00 p.m. that night and, pursuant to prearranged safety procedures, McGugin telephoned Lee when she arrived and told him that she knew the man and that everything was fine. McGugin was not heard from again.
John Stewart, a sergeant in the criminal investigations division of the Baldwin County Sheriff's Department, testified that during the investigation into McGugin's disappearance, he discovered that McGugin had been friends with a man named Mark Evans (whom Sgt. Stewart said she had originally met through the escort service) and that McGugin had babysat for Evans's children on January 30, 1998. Early in the investigation, Sgt. Stewart was informed that a confidential informant knew McGugin and had seen her at approximately 3:00 a.m. on the morning of February 1, 1998, at a nightclub called Solomon's. The informant had told Deputy Scott Ward that he had seen McGugin with two men, both of whom he described. Sgt. Stewart stated that the descriptions the informant had given Deputy Ward matched the descriptions of two people he had learned during the investigation were friends with McGugin  Mark Evans and Robert Ernest Lee III. Sgt. Stewart put together two photographic lineups for the informant to look at, but the informant was unable to positively identify anyone in the lineups.
As a result of the information received from James Lee, Sgt. Stewart visited Woody's Motel early in the investigation and obtained the registration card for room 18 for the night of January 31, 1998; the card listed the occupant as "Mark Evans." However, Sgt. Stewart was suspicious that the person who had rented room 18 on January 31 was not the Mark Evans who had been friends with McGugin. Specifically, Sgt. Stewart testified that although the registration card listed the correct address for Mark Evans, the name of the street was misspelled and the zip code was incorrect. In addition, when he investigated the Social Security number listed on the card, Sgt. Stewart learned that the number was not Mark Evans's number, but was the Social Security number of someone who lived in another state. Eventually, Sgt. Stewart spoke with Mark Evans about McGugin's disappearance. According to Sgt. Stewart, Evans had an alibi for the night of January 31, 1998, and after he confirmed Evans's alibi, Sgt. Stewart said, he no longer considered Evans a suspect.
*634 Donald Pears, an officer with the Mobile Police Department who was assigned to the homicide unit in 1998, testified that during the month of April 1998, he was investigating the murder of a Mobile woman, Kathleen Bracken. Bracken's body had been discovered at the Twilight Motel in Mobile on the evening of April 11-12, 1998. During his investigation, Officer Pears learned that Bracken had been employed by an escort service and that the night before her body was discovered, she had been with a man named "Patrick." One of Bracken's coworkers gave Officer Pears a description of Patrick; that description led Officer Pears to Lewis. Lewis was arrested for Bracken's murder on April 14, 1998. On April 27, 1998, at approximately 4:00 p.m., Officer Pears said, Lewis telephoned him from the Mobile Metro Jail and asked to speak with him. Officer Pears immediately went to the jail to speak with Lewis. Officer Pears testified that before speaking with Lewis, he advised Lewis of his Miranda rights.[1] Officer Pears stated that Lewis did not appear to be under the influence of alcohol or narcotics; that Lewis appeared to understand his rights; that Lewis did not have any problem communicating; and that Lewis agreed to waive his rights and signed a waiver-of-rights form. In addition, Officer Pears testified that he did not threaten Lewis and that he did not promise Lewis anything nor offer any hope of reward to Lewis for making a statement. Lewis then gave a statement to Officer Pears in which he confessed to murdering both Misty McGugin and Kathleen Bracken. The confession was taped, and a redacted version of the audiotape was introduced into evidence and played for the jury.[2]
In his statement to Officer Pears, Lewis stated that approximately two months earlier, he had rented a room at Woody's Motel using a name he had picked out of the telephone book and that he had telephoned an escort service and requested that they send someone to his room. A girl arrived shortly after he called; Lewis said that he saw on her driver's license that her name was "Misty." When the girl arrived, Lewis said, he paid her $150 and they had sexual intercourse. Lewis told Officer Pears that as the girl was about to leave, he decided that he needed his money back to pay his lawyer to defend him against a charge of driving under the influence.[3] At that point, Lewis said, he grabbed the girl and began choking her with a white nylon rope that he had brought with him from home; she resisted at first, but eventually she passed out. Lewis said that he then stabbed her "two or three times in her heart." (C. 503.) Lewis said that he then wrapped the girl in a blanket from the motel room, dragged her outside, and put her in the backseat of her car; he covered her with a tarp he retrieved from his truck. At that point, Lewis said, he went back in the motel room and attempted to clean up  he attempted to wipe his fingerprints off of everything in the room and he took several items from the room, including the girl's purse, and put them in his truck. Lewis stated that he then drove his truck to the Drifter's Lounge, parked it, walked back *635 to the motel, got in the girl's car and began driving to the woods off of Highway 66. As he was driving, Lewis said, he heard the girl "coughing ... and... gurgling" so he stopped the car, got out, and tightened the rope around her neck. (C. 506.) He then continued driving and dumped the girl in the woods, after which, Lewis said, he drove the car back to a local Wal-Mart discount store. On the way, he stopped at a gas station and threw the tarp he had used in a dumpster. Lewis said that he stopped in the Wal-Mart parking lot, searched the car, and then drove the car to the Drifter's Lounge, where he had left his truck. Lewis stated that he took several items from the car, including a tape measure, two screwdrivers, a pink ponytail holder, and approximately $100 in cash (which he found in the glove compartment), and then left in his truck. Lewis said that he went home and searched through the girl's purse, where he found the $150 he had paid her earlier and some additional money. Sometime later, Lewis said, he got rid of everything except the pink ponytail holder. Lewis said that he threw the purse in the woods and that he threw the knife he had used, which he described as a "filet-type knife" with a black handle, into a creek. (C. 506.) Lewis stated that he brought the rope he had used to strangle the girl from home because he had intended from the beginning to kill whoever came to his room. Lewis also stated that he would show Officer Pears where he had left the body in the woods and where he had thrown the purse and the knife.[4]
In his statement, Lewis also admitted to attempting to kidnap another woman in the parking lot of a Wal-Mart store in Baldwin County. Lewis stated that he was parked in the parking lot of the Wal-Mart store watching the people go in and out of the store when he saw a girl get out of her car and go into the store; she did not lock her car. Lewis said that he got into the backseat of the girl's car and waited for her to come out of the store. When the girl got into the car, Lewis said, she saw him, immediately got out of the car, and ran back into the store. Lewis then fled the scene.
Following Lewis's statement, Officer Pears notified the Baldwin County Sheriff's Department regarding Lewis's confession and his offer to show investigators where he had left McGugin's body. Officer Pears arranged to transport Lewis to Baldwin County that night to meet with investigators and to take them to the body. Officer Pears and Lewis met Sgt. Stewart and other investigators in the parking lot of a Gayfer's department store in Daphne on the evening of April 27, 1998, and Lewis then directed the officers to where he had left McGugin's body. Human remains, in a severely decomposed state, were found in a wooded area off of Boaz Road in Baldwin County. Dental records confirmed that the remains were those of Misty McGugin.
Testimony showed that, when found, McGugin's body was in a fetal position. A piece of cloth, like a blouse or sweater, was on the chest area; a single strand of white nylon rope was entwined in McGugin's hair; a pair of women's slacks and women's underwear were found approximately 10 feet from the body; and several Budweiser brand beer bottles were found in the area. Several days later, when investigators searched the area again, an earring that was later identified by McGugin's stepmother as belonging to McGugin and a kitchen-type knife were discovered near where the body had been found.
*636 Julia Gooden, a forensic pathologist with the Alabama Department of Forensic Sciences, testified that she performed an autopsy on McGugin's remains on April 28, 1998. Because of the severely decomposed state of the remains, Dr. Gooden stated that the cause of death was unknown, but that she believed the manner of death was homicide because of the strand of white nylon rope found in McGugin's hair  which indicated possible strangulation  and because the sweater found on the body had cuts in it that Dr. Gooden stated were consistent with stabbing. Dr. Gooden testified that one of the cuts on the sweater was just below the heart in the upper abdominal area and that a cut in that area would cause bleeding, but that it would not be fatal. Another cut on the sweater, Dr. Gooden said, was on the right side near the rib cage, the liver, and the lungs. Dr. Gooden stated, however, that she found no evidence of injury to McGugin's ribs. On cross-examination, Dr. Gooden stated that strangulation could cause death within 3 to 10 minutes, but only if pressure were continuously placed on the neck. Jane Hoff, an anthropologist who does skeletal analyses for the Alabama Department of Forensic Sciences, also studied McGugin's remains. Hoff stated that she observed several fractures on the facial bones, which she described as "perimortem"  i.e., inflicted close to the time of death.
After McGugin's body was found, Lewis was taken back to the Mobile Police Department Headquarters and interviewed a second time by Officer Pears and Sgt. Stewart. Lewis was again advised of his Miranda rights and again signed a waiver-of-rights form. Officer Pears testified that Lewis appeared to understand his rights, that Lewis was not threatened or coerced into making a second statement, and that Lewis was not promised anything or offered any hope of reward for making a second statement. Lewis's second statement to police was videotaped, and a redacted version of that tape was played for the jury.[5]
In his second statement, Lewis gave the following chronology of events regarding the death of Misty McGugin: On a Friday or Saturday night in late January or early February 1998, he rented a room at Woody's Motel. Before he left home, he picked a name out of the telephone book  "Mark" something, he said  to use when registering at the motel. When asked if the name was Mark Evans, Lewis said that it was, but stated that he did not know Mark Evans, that he had just randomly picked a name out of the telephone book. When he checked in the motel at approximately 11:30 p.m., the desk clerk asked for identification, but Lewis told the clerk that he did not have any identification and the clerk then told Lewis to write down his Social Security number; Lewis said that he made up a number. After he checked in, he telephoned several escort services, using the name Mark Evans, in an attempt to have a girl come to his room. All but one of the services he contacted refused to send anyone to Woody's Motel. However, Lewis said, eventually he spoke with a woman at "Casey's" Escort Service who agreed to send someone to his room. Lewis said that a girl telephoned him a few minutes later, spoke with him, and then told him that she would be there shortly. McGugin arrived at approximately 1:00 a.m.[6] According to Lewis, he had *637 never met McGugin before that night. When McGugin arrived, she telephoned her service and told them everything was fine, Lewis paid her $150, and they engaged in sexual intercourse. Afterwards, as McGugin was getting dressed to leave, Lewis decided that he could not let McGugin leave because he needed the $150 he had paid her to help pay for his lawyer. At that point, Lewis grabbed McGugin and began strangling her with his hands. Lewis said that McGugin fought him and pleaded with him not to hurt her. However, Lewis continued strangling McGugin, first with his hands and then with a white nylon rope he had brought from home and hidden underneath the bed in the motel room. According to Lewis, when he stopped strangling McGugin, she was still breathing so he retrieved a knife he had also brought from home and had hidden behind the headboard of the bed, and he stabbed McGugin three times in the chest. At that point, Lewis said, McGugin quit fighting him, but she was still breathing.
Lewis then wrapped McGugin in a blanket and dragged her out of the motel room to the parking lot. Lewis said that McGugin was bleeding a lot and that there was a trail of blood from the room to the parking lot. Lewis decided not to put McGugin in the back of his pickup truck because he did not want anyone to see her; he put her in her car. Because she was bleeding, Lewis got a tarp from his truck and placed it in the backseat of McGugin's car so that no blood would get in the car. Lewis then put McGugin on top of the tarp and wrapped McGugin in the tarp. He then drove his truck to the Drifter's Lounge, parked it, and walked back to the motel, where he attempted to clean up the room. Lewis said that he tried to clean up a bloodstain on the carpet where he had stabbed McGugin, but was unable to, so he moved a chair in the room over the stain to cover it up. Lewis also tried to wipe his fingerprints off of everything in the room and took several items from the room, including the ashtray, the towels he had used in trying to clean up the bloodstain, the beer he had brought with him (he said it was Budweiser brand), and McGugin's purse.
After cleaning up the room, Lewis drove McGugin's car into the woods. As he was driving, he heard McGugin coughing in the backseat, so he stopped the car, got out, and tightened the rope around McGugin's neck until she stopped coughing. He then continued into the woods. After he found a spot in the woods, Lewis said, he took McGugin out of the car and put her near the edge of the woods, engaged in sexual intercourse with her again, dragged her further into the woods, and then left her there. Lewis stated that he did not think McGugin was alive when he left her because, he said, her body was cold and her face was beginning to turn purple. Lewis then drove McGugin's car to the Wal-Mart discount store in Daphne; on the way, he stopped at a gas station and put the tarp he had used in a dumpster. When he arrived at the Wal-Mart store, he searched McGugin's car; he then drove the car to the Drifter's Lounge, where his truck was parked, took several items out of McGugin's car, including a pink ponytail holder, a Zippo brand lighter, several pens, and approximately $100 in cash, and then drove home in his truck. When he got home, Lewis went into the attic[7] and searched through McGugin's purse, where he found the $150 he had paid McGugin *638 and an additional $100 or $150. The next day, Lewis threw McGugin's purse in the woods near Lake Forest; he also said that he thought he threw the knife into a creek. Lewis said, however, that he kept the ponytail holder, the lighter, and the pens that he had taken from McGugin's car. Lewis stated that the ponytail holder was in the nightstand next to his bed and that the lighter was in his toolbox. When asked, Lewis stated that his preferred brand of cigarettes was Marlboro and that he could have smoked in McGugin's car, but that he did not remember.
In his second statement, Lewis also admitted to two other incidents in Baldwin County. First, Lewis said that on March 17, 1998, he was parked in the parking lot of the Wal-Mart store in Daphne watching the people go in and out of the store when he saw a woman, who he later learned was Stephanie Renee Grayson, come out of the store. When he saw Grayson, he decided to follow her and kidnap her. Lewis followed Grayson for awhile and then intentionally rammed the back of her car in order to get her to stop her car. Lewis said that he had a knife with him and that he planned to kidnap Grayson. However, according to Lewis, his plan was spoiled when a woman nearby witnessed the collision and telephoned the police. Second, Lewis stated that sometime after the incident with Grayson (he was not sure about the date), he was again parked in the parking lot of the Wal-Mart store in Daphne when he saw a woman leave her car unlocked and go into the store. Lewis said that he took his knife and got in the backseat of the woman's car to wait for her. When she came out of the store and got in the car, Lewis said, she saw him, screamed, and ran back into the store. Lewis then left. Lewis said that he had intended to kidnap, rape, and murder the woman.
As a result of Lewis's statements, the next day, on April 28, 1998, Sgt. Stewart executed a search warrant at Lewis's home. Sgt. Stewart testified that he found a Zippo brand lighter matching the description Lewis had given him of the lighter he had taken from McGugin's car, a white ponytail holder,[8] and several pens. Sgt. Stewart said that the ponytail holder and pens were found in the nightstand next to Lewis's bed. In addition, Sgt. Stewart said, he found a copy of the Mobile Register dated April 13, 1998, in Lewis's bedroom. The paper included an article about the murder of Kathleen Bracken. On April 30, 1998, Sgt. Stewart also executed a search warrant at Woody's Motel for room 18. A bloodstain was found on the carpet in the location where Lewis had said it would be.
Sarah Elaine Scott, a forensic biologist with the Alabama Department of Forensic Sciences, analyzed several items of evidence collected by the Baldwin County Sheriff's Department, including a piece of carpet taken from room 18 of Woody's Motel, cigarette butts found in McGugin's car (one of which was a Marlboro brand), several Budweiser brand beer bottles found near where McGugin's body was found, a piece of hair from McGugin, and clothing found with McGugin's body. Scott testified that she successfully tested the carpet and the cigarette butts for nuclear DNA, but was unable to obtain large enough samples from the hair and clothing to perform nuclear DNA testing, so she sent those items to the Federal Bureau of Investigation for mitochondrial DNA ("mtDNA") testing. In addition, Scott stated that she also sent the carpet to the FBI for further mtDNA testing. Scott also stated that she was unable to obtain a *639 large enough DNA sample from the beer bottles for nuclear DNA testing, but that she did not send the beer bottles for any further testing because, she said, it was improbable that any DNA could be retrieved from the beer bottles. Scott testified that the blood on the carpet from Woody's Motel belonged to a female, but that because she had no nuclear DNA from McGugin to compare it to, she did not know whether the blood belonged to McGugin or not. As for the cigarette butts found in McGugin's car, Scott said that the DNA on one of the cigarette butts matched Lewis's DNA, but that the DNA on the other cigarette, although belonging to a male, did not match Lewis's DNA. Alice Isenberg, a forensic examiner with the Federal Bureau of Investigation, testified that she performed mtDNA testing on hair that was identified as coming from McGugin and on a bloodstain on a piece of carpet identified as coming from room 18 in Woody's Motel. She said that the DNA from the hair matched the DNA from the bloodstained carpet.
The State also presented testimony regarding the other two incidents to which Lewis confessed. Stephanie Grayson testified that on March 17, 1998, as she was driving to a friend's house from the Wal-Mart store in Daphne, she noticed a truck following her. When she slowed down to turn at an intersection, Grayson said, the truck ran into the back of her car. Grayson stated that after the incident, the man driving the truck, whom Grayson identified as Lewis, got out of his truck and spoke with her. According to Grayson, Lewis reeked of alcohol. Grayson said that Lewis told her that he did not have automobile insurance and that he would prefer not to call the police about the incident. Grayson also testified that Lewis told her that his truck would not start and he asked her for a ride home. She refused. At that point, Grayson said, a woman who lived nearby and who had apparently witnessed the incident came out of her house and hollered to Grayson that she had telephoned the police. Grayson said that after Lewis heard that the police had been notified, he immediately got back into his truck. Grayson said that it appeared to her that Lewis was rummaging through his glove compartment as they waited for the police to arrive.
Scott Edwards, a patrol officer with the City of Spanish Fort, testified that he responded to a call about an automobile collision on March 17, 1998. After investigating the incident at the scene, Officer Edwards said, he determined that Lewis was at fault. Officer Edwards testified that Lewis had told him that he had leaned over to put out a cigarette in the ashtray and that when he looked up he saw brake lights and could not stop. Officer Edwards also testified that Lewis smelled of alcohol, but that Lewis passed all the field sobriety tests. Officer Edwards further testified that both vehicles were operational after the accident and that Lewis drove away from the scene.
Ashley Bitowf testified that one night in April 1998, she had gone to the Wal-Mart store in Daphne at approximately midnight. She stated that when she went to her car after leaving Wal-Mart, she noticed a red truck parked next to it. She said that she had not locked her car when she went into Wal-Mart and that when she got back in the car, the seat was warm, as if someone had been sitting in it. When she looked in the backseat, Bitowf said, she saw someone lying on the back floorboard; she did not see the person's face. Bitowf testified that she immediately got out of the car, ran back into Wal-Mart, and reported the incident. According to Bitowf, she stayed in the store while she waited for the police to arrive and when she went back to the car with the police, *640 the red truck that had been parked next to her car was gone.
Finally, the State presented the testimony of Vonceil C. Smith, a clinical psychologist at the Taylor-Hardin Secure Medical Facility who was ordered by the court to evaluate Lewis to determine his competency to stand trial, his competency to waive his Miranda rights, and his mental state at the time of the offenses. Dr. Smith testified that as part of her evaluation, she looked at records from the Bridgewater Mental Hospital in Massachusetts where Lewis had been a patient for five years, the district attorney's files, and the defense attorneys' files. In addition, Dr. Smith attempted to interview Lewis on two different occasions. Both times, Dr. Smith said, Lewis was uncooperative. According to Dr. Smith, Lewis indicated that he did not know the date or his age, that he did not understand the criminal justice system, and that he was experiencing hallucinations. However, Dr. Smith said, she believed that Lewis was faking his symptoms, that he was unresponsive and uncooperative with her intentionally, not because he suffered from any intellectual or cognitive disabilities. Dr. Smith stated that Lewis "engaged in a number of statements and behaviors designed to feign psychiatric disturbance" (R. 2140), and that she found "no evidence of severe psychiatric impairment." (R. 2141.) Specifically, Dr. Smith said that "there [was] no data to suggest that [Lewis] was unable to understand the distinction between right and wrong" or that "he [had] lost the ability to understand the wrongfulness of his behavior" at the time of the crimes. (R. 2124.) However, Dr. Smith did state that she believed that Lewis had a "severe personality disorder." (R. 2145.)
Lewis asserted two defenses at trial  not guilty and not guilty by reason of mental disease or defect  and he called three witnesses to testify on his behalf. Angela Odom, a friend of McGugin's who lived across the street from her, testified that, at the time of her death, McGugin was dating a man named Mark Evans. According to Odom, Evans often sent McGugin flowers and gifts, and, at one point, she saw Evans bring McGugin a clothes dryer. Odom further testified that she had never seen Lewis in her life and that she had never heard McGugin mention Lewis.
Mark Steven Evans testified that he had met Misty McGugin at a Circle K convenience store near his home and that they had become friends and eventually started dating. He denied meeting her through Abigail's Escort Service, but stated that he knew that she worked for Abigail's when he first met her. Evans stated that he had previously telephoned Abigail's to speak with McGugin and that he had even gone to the service to see McGugin, but he stated that he never used the services offered by Abigail's. Evans also said that McGugin was not happy working for the escort service, that he had encouraged her to quit, and that when she told him she had another job, he had assumed that she had quit. Evans stated that McGugin babysat his children on January 31, 1998; that when he got home that night, his son was sick and he took him to the doctor; that when he got back home, McGugin was gone; and that he never saw McGugin again. Evans stated that after McGugin had left, he had no one to watch his children, so he drove to Mississippi that night to pick up his ex-wife so that she could watch the children the next day when he went to work. Evans further testified that he had a friend named Robert Ernest Lee III, and that he and Lee had been to the Drifter's Lounge and to Solomon's on previous occasions, but that they were not at the Drifter's Lounge or at Solomon's on *641 the evening of January 31, 1998. Evans denied killing McGugin.
Prudence Baxter, a psychiatrist with the Department of Mental Health in Massachusetts, testified that in 1987, while living in Massachusetts, Lewis had been charged with the attempted murder and assault of a five-year-old girl; that he had been found incompetent to stand trial and placed in the Bridgewater State Mental Hospital; and that he had remained in the hospital for approximately five years. Dr. Baxter testified that when Lewis was first taken to Bridgewater, he was initially diagnosed as suffering from "recurrent major depression" to the point of being suicidal. (R. 1714.) Later, that diagnosis was amended to "major depression with psychotic features" because Lewis was paranoid and delusional. (R. 1715.) According to Dr. Baxter, Lewis believed that people were trying to hurt him, and he often had delusions about his ex-wife, Lena. Subsequently, Lewis's diagnosis was again amended to "paranoid delusional disorder." (R. 1715.) Throughout his stay at Bridgewater, Dr. Baxter said, Lewis consistently refused to take medication that could have helped his condition; he maintained that there was nothing wrong with him; and he repeatedly asserted that he wanted to go to trial on the attempted-murder and assault charges and be found guilty. Finally, in 1990, doctors at Bridgewater obtained a court order allowing them to force Lewis to take medication. At that point, Dr. Baxter said, Lewis was placed on Prozac and his behavior improved markedly; although he remained somewhat paranoid, the paranoia lessened.
Dr. Baxter testified that she evaluated Lewis in 1992, at the request of his defense attorney at the time. According to Dr. Baxter, at that point, Lewis was "no longer demonstrating florid psychotic symptoms," he was no longer depressed, and he acknowledged that the medication was helping him. (R. 1711.) However, Dr. Baxter concluded that at the time of the crimes in 1987, Lewis was not criminally responsible for his actions because, she said, he was suffering from a significant mental illness that contributed to his conduct. According to Dr. Baxter, Lewis pleaded guilty to the charges against him, was released from Bridgewater in April 1992, spent a few months in prison, and was then released.
Dr. Baxter also testified that she interviewed Lewis a second time on December 4, 1999, just before the present trial began, at the jail in Baldwin County. Dr. Baxter stated that she first attempted to determine whether Lewis was malingering, i.e., whether he was faking his symptoms, because she had read the reports from other psychologists and psychiatrists indicating that Lewis was malingering.[9] Dr. Baxter testified that Lewis admitted to her that he had not been truthful during the other evaluations. However, Dr. Baxter said, she believed that Lewis was being truthful with her and that he was not malingering because, in her opinion, Lewis's description of his symptoms was not exaggerated as would be expected with someone who is malingering. In addition, Dr. Baxter said that Lewis's account of events from his past was consistent with the account he had given her in 1992 when she evaluated him. Dr. Baxter testified that, during the second evaluation, Lewis indicated to her that he wanted to be executed regardless of whether his attorneys could mount a *642 defense because his paranoid delusions were becoming intolerable. Dr. Baxter stated that Lewis's wish to be executed was consistent with his long history of suicide attempts. In her opinion, Dr. Baxter said, Lewis was still suffering from paranoid delusional disorder, suicidal tendencies, and alcohol abuse, as he had been when he was at Bridgewater. Specifically, Dr. Baxter stated that Lewis was still having paranoid delusions that his ex-wife Lena was trying to hurt him. According to Dr. Baxter, because of his delusions, Lewis would get agitated whenever he saw someone who resembled Lena because he believed, not necessarily that the person was Lena, but that the person was somehow connected to Lena or that she had been sent by Lena.[10] However, Dr. Baxter stated that she could not offer a "definitive opinion" as to Lewis's mental state at the time of the present offenses. (R. 1740.)
Although, as noted above, Lewis pleaded not guilty and not guilty by reason of mental disease or defect, and the jury was instructed on the defense of insanity, Lewis's main defense at trial was not that he was insane at the time of the offense but, rather, that he did not murder Misty McGugin. Through his defense attorneys, Lewis asserted that he did not murder McGugin and that he was insane at the time he confessed to the murder, i.e., that he confessed to a crime he did not commit in order to fulfill his suicidal tendencies. Lewis's attorneys argued that although Lewis may have witnessed the murder or been involved in disposing of McGugin's body, thus explaining how he knew the location of the remains, Mark Evans actually committed the murder. Lewis's attorneys argued that there were facts and leads the State had not pursued during its investigation and pointed out discrepancies between Lewis's statements to police and the State's evidence, which, they argued, showed that Lewis was not the person who had murdered McGugin. Some of the points stressed by Lewis's attorneys were the following: (1) that one of the cigarette butts found in McGugin's car did not contain Lewis's DNA, but did contain the DNA of a male and that the State never compared the DNA on that cigarette butt to Mark Evans's DNA; (2) that Misty McGugin was seen by a confidential informant who could not be found for trial at Solomon's at approximately 3:00 a.m. on the morning of February 1, 1998, after the time the State argued Lewis had killed McGugin and that she was seen with two men, one of whom matched the description of Mark Evans and one of whom matched the description of Evans's friend, Robert Ernest Lee III; (3) that Lewis said in his statement that McGugin worked for Casey's Escort Service, when, in fact, she worked for Abigail's Escort Service; (4) that Lewis said in his statement that he had spoken with a woman at the escort service, when, in fact, the State's evidence showed that a man, James Ashley Lee, answered the telephone call on the night of January 31, 1998; (5) that Lewis said in his statement that he had picked the name Mark Evans out of the telephone book and that he did not know Mark Evans and, yet, Mark Evans happened to be a friend of McGugin's; and (6) that Lewis's records from Bridgewater Mental Hospital in Massachusetts, which were introduced into evidence, showed that, at one point, Lewis had claimed to have murdered his ex-wife Lena when, in fact, he had not.
On appeal, Lewis raises 15 issues, many of which he did not raise by objection *643 in the trial court. Because Lewis was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court has recognized that "`the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

I.
Before trial, Lewis's attorneys requested that Lewis be evaluated regarding his competence to stand trial and that a jury determine his competency. The trial court granted Lewis's requests and, in a separate proceeding before the trial on the indictments, a jury found Lewis competent to stand trial. Lewis contends that several errors occurred during the competency trial that require reversal of his convictions and his sentence of death. (Issue III in Lewis's brief.)
At the competency trial, the State called Sgt. John Stewart to testify regarding the facts and circumstances surrounding the murder of Misty McGugin and the offenses involving Stephanie Grayson and Ashley Bitowf. Sgt. Stewart testified as to the investigation into the disappearance and murder of McGugin, as to the facts and circumstances surrounding the crimes against Grayson and Bitowf, and as to Lewis's confessions to those crimes, as well as to other crimes. During Sgt. Stewart's testimony, the complete videotape of Lewis's second confession was played for the jury. Unlike the redacted version of the tape that was played during the guilt phase of Lewis's trial, the competency jury heard the entire tape, including Lewis's confessing to the murder of Kathleen Bracken in Mobile County and to murdering two women in Georgia. In addition, the State specifically questioned Sgt. Stewart regarding his interaction with Lewis during the confession and during the time *644 when Lewis showed law-enforcement officers the location of McGugin's remains. Sgt. Stewart testified that Lewis was very cooperative, that he was coherent, and that he had no trouble communicating with officers or understanding what was being discussed.
The State also called Dr. Vonceil C. Smith to testify. Dr. Smith stated that she first evaluated Lewis in December 1998; that during that evaluation, Lewis was uncooperative and "engaged in a number of statements and behaviors designed to feign psychiatric disturbance" (R. 986-87); that she believed Lewis's unresponsiveness to his attorneys was "volitional" (R. 988); and that, in her opinion, Lewis was competent to stand trial at that time. Dr. Smith stated that she evaluated Lewis a second time just before the competency trial and that, during this evaluation, she administered the Minnesota Multiphasic Personality Inventory ("MMPI") test in an effort to obtain a psychological profile of Lewis's personality characteristics and mental state. However, the profile resulting from the test, Dr. Smith said, was invalid because the results indicated that Lewis had "presented himself in the least favorable light possible" when taking the test. (R. 990.) Dr. Smith stated that, in her opinion, Lewis was competent to stand trial and that, although he was suffering from a personality disorder, he was not suffering from a formal thought disorder, a major affective disturbance, or a severe cognitive impairment that would impede his ability to understand the proceedings against him or to assist his attorneys with his defense.
Lewis called two witnesses to testify on his behalf at the competency trial. First, John C. Williams, the attorney representing Lewis on the murder charge against Lewis in Mobile County based on the killing of Kathleen Bracken, testified that he had visited Lewis on three occasions to discuss the Mobile case. On each of those occasions, Williams said, Lewis was unresponsive and did not appear to understand what was going on around him. Williams stated that he did not believe that Lewis understood anything he said to him and that the only time Lewis responded to him was when he mentioned Lewis's ex-wife Lena.
Dr. Catherine Lee Boyer, a forensic psychologist, testified that she evaluated Lewis on November 1, 1999, to determine his competency to stand trial. Dr. Boyer said she administered three tests to Lewis: a test of "memory malingering" to determine whether Lewis was pretending to have memory impairments; a "structured interview of reported symptoms" test ("SIRS") to determine whether Lewis was pretending to have psychiatric problems; and the MMPI. The results of all those tests, Dr. Boyer said, indicated that Lewis was malingering, i.e., that he was faking his symptoms. However, Dr. Boyer also said that Lewis was suffering from a personality disorder with both paranoid and antisocial features, although he was not suffering from "a major mental illness." (R. 1129.) Dr. Boyer said that, to help her determine which of Lewis's symptoms were faked and which were real, she reviewed Lewis's records from Bridgewater hospital in Massachusetts[11]; she spoke with Lewis's attorneys and family members; and she reviewed the sheriff's department's case file, including the videotape of Lewis's confession. Dr. Boyer said, however, that because some of Lewis's symptoms were faked and some were not, she could not give a definitive opinion as to Lewis's competency to stand trial. When specifically asked whether she felt *645 "comfortable" saying that Lewis was competent, she stated: "No. I guess my position is  I don't know. I'm concerned about that he may not be, but I'm not confident that he is." (R. 1145.) However, Dr. Boyer also stated the following during her testimony:
"I think that, you know, the information from attorneys that I've gotten is that a lot of things that he has done, I don't think, fit with what his disability is. I think its very clear that he knows who his attorneys are, even though he may have sometimes acted like he doesn't. That's something that I think is definitely bogus.
"I think that he  you know, he knows what the Judge's role is, he knows what a trial is, I think he knows what a plea bargain is, I think he knows what the consequences of a conviction are in his case. I think he knows the charges against him. I think he knows what events have happened in the course of these proceedings. So, I think those are all things  I think he has a factual understanding of the proceedings. I don't think there's any problem with that at all."
(R. 1136-37.)
Initially, we note that the State argues that none of Lewis's arguments regarding the competency trial are preserved for review and that this Court should not apply the plain-error rule to the competency trial because, it says, plain-error review is applicable only in cases in which the death penalty has been imposed. Because the death penalty was not imposed at the conclusion of the competency trial, the State argues, this Court should not review Lewis's claims relating to that trial for plain error. We disagree.
As noted above, Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
A "case" is defined in Black's Law Dictionary 206 (7th ed.1999), as "[a] proceeding, action, suit, or controversy at law or in equity." A "proceeding" is defined as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." Black's Law Dictionary 1221 (emphasis added). Contrary to the State's contention, merely because the death penalty is not imposed at the conclusion of the competency trial does not remove the competency trial from plain-error review. The death penalty is not imposed at the conclusion of the guilt phase of a capital trial either, yet plain-error review applies at that phase because the guilt phase is a part of the "proceedings under review." A competency trial is also a part of the "proceedings under review" in a death-penalty case and is, therefore, subject to plain-error review.

A.
Lewis contends that the trial court erred in allowing John Williams, his attorney on the Mobile case, to answer a hypothetical question posed by the prosecutor during cross-examination. Because Lewis did not object to the prosecutor's question, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
Lewis complains about the following:
"[Prosecutor]: I want to ask you to suppose you're back in law school at the University of Alabama.

*646 "[Williams]: I'd rather not, but I will.
"[Prosecutor]: I think I understand. And I want to ask you that the law professor gives you a test in which the facts are that a man has killed a woman, he has confessed on videotape to three police officers, he has taken them to where the body has been found, and they have gone back to the hotel where the blood-soaked carpet lies.
"How strong of a factual case would you think the State of Alabama would have? That would be a case Mr. Graddick [[12]] would try, wouldn't it?
"[Williams]: Mr. Graddick would enjoy trying that case.
"[Prosecutor]: Okay. So, the professor would then say, you are a lawyer, think of a defense for this man. What defense could we use? What is the best defense under these circumstances that you can imagine?
"[Williams]: Well, initially I would think that ... you would raise the first offense [sic] of incompetency to stand trial.
"[Prosecutor]: Incompetency to stand trial. And what would be the best way for this man to prove that he was not competent to stand trial? Not communicate with you?
"[Williams]: You're assuming that the man has spoken to his lawyer about this or not?
"[Prosecutor]: No. I'm assuming that the man has already been through this process before and understands how the system works. And when a lawyer comes to talk to him about it, he realizes his best defense is not to communicate and to malinger."
(R. 1064-66.) At this point, the prosecutor moved on to another line of questioning (See Part I.B. of this opinion.)
Lewis contends that the hypothetical question posed by the prosecutor was improper because, he says, Williams was not an expert and, therefore, could only testify to facts within his knowledge and not to hypothetical facts.
Rule 701, Ala.R.Evid., provides:
"If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."
(Emphasis added.)
"`A nonexpert witness cannot give an opinion except when it is derived from facts known to him and disclosed by him to the jury. A hypothetical state of facts is, therefore, not an allowable basis for the opinion of a nonexpert.' Ragland v. State, 125 Ala. 12, [26,] 27 So. 983, 986, and cases therein cited. The reason for the above rule is that the hypothetical form of presentation is proper only when the testifying witness possesses superior knowledge and skill in drawing inferences from certain premises."
Grissom v. State, 33 Ala.App. 23, 28, 30 So.2d 19, 24 (1947), cert. denied, 249 Ala. 125, 30 So.2d 26 (1947). See also Honeywell, Inc. v. Bel Air Corp., 518 So.2d 100, 102 (Ala.1987) ("Alabama's case law is clear that a non-expert may not be permitted to answer a hypothetical question."); and Newsome v. State, 570 So.2d 703, 715 (Ala.Crim.App.1989) ("A hypothetical *647 statement of facts is not an allowable basis for the opinion of a non-expert.").
It was error for the prosecutor to pose a hypothetical situation to Williams, who was neither offered, nor accepted, as an expert witness. However, we do not believe that the error rises to the level of plain error.
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), cert. denied, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002).
"`The narrowness of the plain error rule is a reflection of the importance, indeed necessity, of the contemporaneous objection rule to which it is an exception....
"`The contemporaneous objection rule ... promotes the salutary interest of making the trial the main event. Failure to enforce it "tends to detract from the perception of the trial of a criminal case ... as a decisive and portentous event." Wainwright v. Sykes, 433 U.S. 72, 90 [97 S.Ct. 2497, 53 L.Ed.2d 594] ... (1977). Moreover, requiring timely objections allows the trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial. See United States v. Sorondo, 845 F.2d 945, 948-49 (11th Cir.1988). A full record and a prior decision in the district court are essential ingredients to our substantive review of the issues  they flesh out an issue in a way the parties' briefs may not.
"`"In the absence of plain error ... it is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate." Adler v. Duval County School Bd., 112 F.3d 1475, 1481 n. 12 (11th Cir.1997). Because the contemporaneous objection rule is essential to the integrity and efficiency of our judicial process, we have stressed that "the plain error test is difficult to meet." United States v. King, 73 F.3d 1564, 1572 (11th Cir.1996); accord, e.g., United States v. Sorondo, 845 F.2d at 948-49; United States v. Chaney, 662 F.2d 1148, 1152 n. 4 (5th Cir. Unit B 1981).'
"United States v. Pielago, 135 F.3d 703, 709 (11th Cir.1998).
"`While the plain error doctrine lessens the blow of a rigid application of the contemporaneous objection requirement, it is to be used sparingly, since the unwarranted extension of the exacting definition of plain error would skew the rule's careful balancing *648 of the need to encourage all trial participants to seek a fair and accurate trial the first time around against the insistence that obvious injustice be promptly redressed. Reviewing courts are not to use the plain error doctrine to consider trial court errors not meriting appellate review absent timely objection.'
"5 Am.Jur.2d Appellate Review § 767, p. 437 (1995). See also Ex parte Woodall, 730 So.2d 652, 657 (Ala.1998) (the plain-error exception is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result') (internal quotes and citations omitted).
"One of the factors for the reviewing court to consider in its determination of whether an alleged error constitutes plain error is `whether a proper and timely objection at trial would have cured the error or would have enabled the trial court to prevent injustice.' 5 Am.Jur.2d, supra, at § 774, p. 443-45 (footnotes omitted). `[T]he doctrine [of plain error] is less likely to be applied where the error could have been readily corrected by an objection at trial, or where such an objection may have led the government to introduce additional evidence on the issue.' Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 27.5(d), p. 1160 (2nd ed.1992). See, e.g., United States v. Hayes, 589 F.2d 811, 825 (5th Cir.) (`Rule 52(b) will not be used to allow counsel for the defendant to gamble first on acquittal and then, upon conviction, to raise on appeal any matters which could have been easily remedied at trial.'), cert. denied, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). See also Jones v. United States, 527 U.S. 373, 386, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (preservation-of-error requirements `enable a trial court to correct any instructional mistakes before the jury retires and in that way help to avoid the burdens of an unnecessary retrial')...."
Thomas v. State, 824 So.2d 1, 14-15 (Ala.Crim.App.1999).
We do not believe that the prosecutor's improper questioning of Williams seriously affected the fairness, integrity, or reputation of the competency proceedings. The question was designed to inform the jury of the State's belief that Lewis, having been through the judicial process once before in Massachusetts and having been declared incompetent to stand trial at that time, knew how to create doubt as to his competency in order to avoid prosecution. This was a valid argument, and it could have been made even without the improper questioning of Williams; the evidence presented at the competency trial supported the State's argument in this regard. There was no evidence at the competency trial, not even from Lewis's own expert witness, indicating that Lewis was incompetent to stand trial. Rather, all of the evidence showed that Lewis was competent and that he was being purposely uncooperative with his attorneys. In addition, the error could have easily been cured had Lewis objected to the questioning. Based on our review of the record, we find that the prosecutor's questioning did not amount to plain error.

B.
Lewis also contends that the trial court erred in allowing the State to elicit hearsay testimony from John Williams regarding a report submitted by Dr. C. Van Rosen, a psychologist who was appointed by the Mobile Circuit Court in 1998 to evaluate Lewis to determine his competence to stand trial for the Mobile County murder charge and his mental state at the time of that offense. In the report, Dr. Van Rosen concluded that Lewis was competent *649 to stand trial. Specifically, Lewis complains about the following during cross-examination of Williams:
"[Prosecutor]: ... Do you know Dr. Van Rosen?
"[Williams]: I do. He prepared the report in my case.
"....
"[Prosecutor]: Okay. What was Dr. Van Rosen's conclusions concerning this man and his ability to stand trial in your case?
"[Lewis's counsel]: Judge, I object. That assumes facts not in evidence.
"[Prosecutor]: They raised that.
"[Lewis's counsel]: You raised Dr. Van Rosen.
"[Prosecutor]: They raised it through this testimony.
"[Lewis's counsel]: You raised it through a hypothetical question, to a law school scenario.
"[Prosecutor]: Well, I'm off of that.
"THE COURT: We're off of that, now. Overruled.
"[Prosecutor]: This man has given an opinion based upon the competency to stand trial. And you are aware of Dr. Van Rosen's findings, aren't you?
"[Williams]: I am aware.
"[Prosecutor]: And those findings, are they not, are almost exactly the findings of Dr. Smith?
"[Williams]: I haven't compared the reports, but I do know that Dr. Van Rosen, his conclusion was that Mr. Lewis would be competent.
"[Prosecutor]: And that he was a malingerer?
"[Williams]: I believe that that word was mentioned."
(R. 1067-68.) Lewis argues that Williams's testimony regarding Dr. Van Rosen's finding that Lewis was competent was hearsay; that it did not fit into any exception to the hearsay rule; and that it was prejudicial because, he says, his competency was "hotly contested," with the State's expert, Dr. Smith, testifying that Lewis was competent to stand trial, and his expert, Dr. Boyer, testifying that Lewis was not competent to stand trial. (Lewis's brief at pp. 23-24.) Because Lewis did not object to Williams's testimony on the ground that it was hearsay, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala.R.Evid. Williams's testimony was classic hearsay  he testified to a statement by Dr. Van Rosen that Lewis was competent and that statement was offered by the State to prove the truth of its contents, i.e., that Lewis was, in fact, competent. In addition, the testimony did not fall into any of the exceptions to the hearsay rule. However, after reviewing the record of the competency trial, we find that any error in allowing this testimony was harmless.
"`The standard for determining whether constitutional error is harmless is whether the court can "declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In determining whether constitutional hearsay error is harmless, a court may consider numerous facts, including
"`"`the importance of the [declarant's] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the [declarant] on material points, ... in the *650 overall strength of the prosecution's case.' Delaware v. Van Arsdall, 475 U.S. [673], 684, 106 S.Ct. 1431, 889 [89] L.Ed.2d 674 [(1986)]."
"`James v. State, 723 So.2d 776, 781 (Ala.Crim.App.), cert. denied, 723 So.2d 786 (Ala.1998).'
"Ex parte Dunaway, 746 So.2d 1042, 1050 (Ala.1999) (Lyons, Justice, concurring in the judgment and concurring in part and dissenting in part as to the rationale)."
Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___, ___ (Ala.Crim.App.2001).
Lewis's competency was not "hotly contested" as Lewis claims it was. As noted above, the State's expert, Dr. Smith, testified that, in her opinion, Lewis was competent to stand trial; that his unresponsiveness to his defense counsel was "under his own control"; that he was feigning symptoms of psychiatric disturbance; and that she found no evidence suggesting a "formal thought disorder, major effective disturbance, or severe cognitive impairment," but that he was suffering from a borderline personality disorder. (R. 988-91.) In addition, contrary to Lewis's contention, his own expert, Dr. Boyer, did not testify that he was not competent to stand trial. Rather, Dr. Boyer stated that she could not give a definitive opinion as to Lewis's competency. She stated that because Lewis was suffering from a personality disorder but was also faking symptoms of mental illness it was difficult to determine which symptoms were real and which symptoms were faked and, thus, she did not feel comfortable stating a definitive opinion as to whether Lewis was competent. However, as noted above, Dr. Boyer testified that she believed that Lewis understood the proceedings against him; that he knew what a trial was and the roles of defense counsel and the judge; and that he knew what the charges against him were and what the consequences were if he was convicted. She also stated that she believed Lewis's alleged problems communicating with his attorneys were, in part, a product of his personality disorder, but were mainly feigned, and that she believed Lewis was able to recite facts to his attorneys and to question his attorneys, if he chose to do so. Dr. Van Rosen's conclusions  that Lewis was malingering, i.e., feigning psychiatric symptoms, and that he was competent  were the exact same conclusions as those of Dr. Smith and were substantially the same conclusions as those of Dr. Boyer.
"`[T]estimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred.' White v. State, 650 So.2d 538, 541 (Ala.Cr.App.1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239 (Ala.Cr.App.1995).... `The erroneous admission of evidence that is merely cumulative is harmless error.' Dawson v. State, 675 So.2d 897, 900 (Ala.Cr.App.1995)."
Flynn v. State, 745 So.2d 295, 307 (Ala.Crim.App.), cert. denied, 745 So.2d 309 (Ala.1999). Based on the record before us, we conclude that any error in the admission of hearsay testimony regarding Dr. Van Rosen's findings was harmless beyond a reasonable doubt.

C.
Lewis next contends that the trial court erred in allowing into evidence at the competency trial what he terms "severely prejudicial and irrelevant evidence concerning [his] level of cooperation in the investigation of the crimes with which he was charged, the facts of the crimes with which he was charged, and his confession to those crimes and other crimes." (Lewis's *651 brief at p. 24.) He maintains that the evidence "was irrelevant to the issue to be decided by the jury in the competency hearing" and "was prejudicial beyond all doubt to his right to have a jury fairly determine his present competency to stand trial." (Lewis's brief at p. 25.) Because Lewis did not object to the admission of this evidence, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
As noted above, the State presented evidence, through the testimony of Sgt. Stewart, of the nature and circumstances surrounding the murder of Misty McGugin and the crimes against Ashley Bitowf and Stephanie Grayson. The State also introduced into evidence and played for the jury the videotape of Lewis's confession, which included his confession to the crimes in Baldwin County, as well as to the murder of Kathleen Bracken in Mobile County and the murder of two women in Georgia.
As to the admission of evidence regarding the nature and circumstances of the crimes with which Lewis was charged in the present case, we find no error. Rule 11.1, Ala.R.Crim.P., provides:
"A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant."
(Emphasis added.) The test for competency requires that a defendant have an understanding not only of the legal proceedings, but also of the facts of the charged crimes. If a jury is to determine a defendant's competency to stand trial and a part of the test for competency is an understanding of the facts and nature of the charged crimes so that he may assist in his defense, such facts are not irrelevant and it is not error for the State to present to the jury evidence regarding those facts. See, e.g., Holmes v. State, 342 So.2d 28, 31 (Ala.Crim.App.1976), cert. denied, 342 So.2d 36 (Ala.1977) ("We know of no authority, case or statutory, requiring reversal because the nature of the offense is disclosed to a special jury hearing testimony on the accused's competency to stand trial."). There was no error in allowing the State to present evidence at the competency trial of the nature and circumstances of the crimes with which Lewis was charged.
Moreover, even if there was error, it was clearly invited.
"`A party cannot assume inconsistent positions at trial and on appeal, and a party cannot allege as error proceedings in the trial court that were invited by him or were a natural consequence of his own actions.' Fountain v. State, 586 So.2d 277, 282 (Ala.Cr.App.1991). `The invited error rule has been applied equally in both capital cases and noncapital cases.' Rogers v. State, 630 So.2d 78 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992). `An invited error is waived, unless it rises to the level of plain error.' Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991)."
Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The record reflects that not only did Lewis not object to the State's presenting evidence about the facts and nature of the crimes charged, but before the competency trial began, Lewis's attorneys conceded that such evidence was relevant and that it would be admissible. In addition, during the competency trial, Lewis's attorneys actually argued to the jury that it should consider the number, nature, and complexity *652 of the charges against Lewis in determining whether Lewis was competent. Lewis's attorneys specifically argued that although Lewis may have been able to understand a simple misdemeanor charge, he simply was not able to understand the numerous and complex felony charges he was facing and that, therefore, he was incompetent to stand trial on the specific charges against him. Any error in allowing the State to present evidence of the nature and circumstances of the crimes was invited by Lewis himself.
We likewise find no error in the admission of Lewis's confession to the murder of Kathleen Bracken in Mobile County and to two murders in Georgia. During the competency trial, Lewis presented evidence indicating that he had been diagnosed in 1989 as depressed, distraught, suicidal, paranoid, and delusional. He introduced into evidence his records from Bridgewater Hospital in Massachusetts and his own expert testified that her diagnosis of Lewis was based, in large part, on Lewis's previous psychiatric treatment in Massachusetts. Lewis's attorneys argued that his history of mental illness and his uncooperative attitude toward his attorneys in this case showed that Lewis was not competent to stand trial. On the other hand, the prosecutor argued throughout the competency trial that Lewis's calculated actions to cover up his crimes and his behavior at the time he confessed  appearing calm and remembering very specific details of the crimes  were inconsistent with his present uncooperative behavior toward his attorneys and, therefore, showed that he was not incompetent, but that he was faking his symptoms in order to avoid prosecution. In his confession, Lewis not only described in detail the murder of Misty McGugin, he also recited details of the murder in Mobile County and of the two murders in Georgia. He described in detail where he had hidden the bodies of the women in Georgia and why he had not hidden the body of Kathleen Bracken in Mobile County and he described where he had hidden the murder weapon he had used in one of the Georgia murders. Just as Lewis's history of mental illness, dating back approximately 10 years, was relevant to his present competency to stand trial, so were Lewis's calculated actions to try to cover up his crimes (dating back approximately five years for the Georgia murders). We find no error in the admission of this evidence.

D.
Lewis also contends that the prosecutor engaged in misconduct during both opening and closing arguments. Lewis did not object to any of the alleged prosecutorial misconduct; therefore, we review his claims under the plain-error rule. See Rule 45A, Ala.R.App.P.
"This court has stated that `[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.' Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). `In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."' Bankhead, 585 So.2d at 107, quoting Darden *653 v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). `A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury.' Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, `statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.' Bankhead, 585 So.2d at 106. `Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument.' Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id."
Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002). Moreover, "`[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).

1.
First, Lewis contends that the prosecutor improperly referred to the facts and circumstances surrounding the crimes with which Lewis was charged and Lewis's confession to those crimes as well as his confession to other crimes during both opening statements and closing arguments.
"`"During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference."' Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987) (citation omitted), rev'd on other grounds, 523 So.2d 1118 (Ala.1988).
"`"The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Crim.App.), cert. denied, 340 So.2d 1140 (Ala.1976 [1977]). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Crim.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Crim.App.1979); McQueen v. State, 355 So.2d 407 (Ala.Crim.App.1978)."'
"Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999), writ quashed, 767 So.2d 1142 (Ala.2000), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App. *654 1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981)."
Johnson v. State, 823 So.2d 1, 47 (Ala.Crim.App.), cert. denied, 823 So.2d 57 (Ala.2001), cert. denied, 535 U.S. 1085, 122 S.Ct. 1978, 152 L.Ed.2d 1035 (2002). Because we have already determined that the facts and circumstances regarding the crimes with which Lewis was charged and Lewis's confession to those crimes, as well as to other crimes, were properly admitted during the competency trial, see Part I.C. of this opinion, the prosecutor's reference to this evidence during opening statements and closing arguments was proper.

2.
Lewis also contends that during closing arguments the prosecutor "improperly argued the wrong standard of determining competency to stand trial" and "improperly shifted the burden of proof" to him to prove his incompetence. (Lewis's brief at pp. 29-30.)
In context, the prosecutor argued the following during closing arguments:
"You got to watch him on videotape right after he was arrested. You can see the stripes on his clothes, the jail stripes. They took that videotape, you saw it on that machine here, and he began to tell you things. He was talking to John Stewart....
"There was not one aspect of paranoia. There was not one aspect of his inability to remember facts. There was not one aspect of his inability to cooperate with the police from a mental standpoint. Did he ever cooperate....
"He took a body there. He remembered having sex with her at that road in those woods, bloody and strangled, and it was corroborated because her panties were found 10 or 15 feet away from where the body was found. And the rope, a white nylon rope that he took with him was found around her hair. The rope that he used to strangle her. He remembered those things and they were truthful and consistent and [the] police didn't know. He then said some more things. He talked about the other two women he wanted to get and his disguise and plan in order to get them. And lo and behold, police reports from those two women surfaced. It was truthful, factual.
"He remembered something else. He remembered a case in Georgia.... Accurate, more accurate than our forensic scientists, able to hide better than our police can find, and able to remember specifically the facts of his misdeed.
"That is not the situation of a mentally distraught person that you saw on that tape. That is a person in cold blood reciting facts of his crime accurately. No suggestion of paranoia, no suggestion of depression. He gets depressed when it gets close to facing you."
(R. 1211-13.) (Portion of argument complained of by Lewis emphasized.) Lewis maintains that the prosecutor's statement that Lewis was not mentally distraught, was not paranoid, and was not depressed when he gave his statement to police improperly suggested to the jury that Lewis was required to prove that he was incompetent by showing mental distress, paranoia, and depression.
Lewis's characterization of the prosecutor's statement is strained and unreasonable. The prosecutor never stated that the burden of proof was on Lewis to prove that he was incompetent to stand trial, and nothing in the prosecutor's closing arguments, including the above-quoted passage, could have reasonably been construed by the jury as placing the burden of proof on Lewis. In fact, the prosecutor *655 specifically told the jury at the beginning of his closing argument that the burden was on the State to prove that Lewis was competent to stand trial. In addition, the prosecutor's reference to mental distress, paranoia, and depression did not, in any way, suggest that Lewis could not be found incompetent unless he was mentally distraught, paranoid, and/or depressed. The reference was simply a comment on the evidence that had been presented during the competency trial, specifically, the videotape of Lewis's confession. As the State correctly points out in its brief to this Court, Lewis's own expert testified that the videotape of his confession was relevant to Lewis's competency and was, in fact, a significant piece of evidence on which she based her evaluation. We find no error, much less plain error, as to this claim.

3.
Lewis also contends that the prosecutor "denigrated [his] due process rights" by comparing his rights to the rights of the people of Baldwin County. (Lewis's brief at p. 30.) In context, the prosecutor stated the following during closing arguments:
"Due process is important and that's what this process is about. Due process, evidence under oath for the jury, people to make a decision. It's due process. He's entitled to that under our constitution. He's entitled to that under our law. He's entitled to that as a human being. He's entitled to it. I make no statement against that, but I submit to you that the people of the State are entitled to due process as well. And a malingerer who fakes mental illness in order to avoid accountability should go to the next level because this process is not a one way street.
"These proceedings are not just for him. It is for the people of Baldwin County. They have rights, too. And one of those rights is life, liberty and the pursuit of happiness, and one of those rights is a proceeding under the law in which their rights will be protected as well. Due process works two ways, not one way. And when you're thinking of that due process, I want you to think of him and every right you can ascribe to it, add a few, but I want you to think of the rights of the people of Alabama and the people of this County to have this proceeding proceed with due process as well."
(R. 1233-34.) (Portion of argument complained of by Lewis emphasized.)
Lewis maintains that the prosecutor's comments about the people of Baldwin County and their due-process rights are similar to comments about victims' rights condemned by this Court in McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). In McNair, the prosecutor made numerous references to the victim's rights and repeatedly implied that the victim's rights should be weighed against the appellant's rights in determining the appellant's guilt. This Court held that, although the prosecutor's comments were improper, they "were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict." McNair, 653 So.2d at 338. See also Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001), cert. denied, 535 U.S. 1058, 122 S.Ct. 1921, 152 L.Ed.2d 828 (2002); and Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), aff'd, 791 So.2d 1043 (Ala.2000), *656 cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001).
Although the comments here were not nearly as egregious as the comments in McNair, we believe that they were improper, especially considering that they were made in the competency trial. The prosecutor stated that the jury should consider the rights of the people of Baldwin County in determining whether Lewis was competent to stand trial and implied that those rights would not be protected if Lewis was found incompetent and was not held accountable for his actions. However, in a competency trial, the sole issue is whether the accused is competent to stand trial for the crimes with which he or she is charged. The issue is whether the accused can be held accountable for the crimes charged, not whether he or she should be held accountable. Although the prosecutor's comments were improper, we nevertheless believe, as did the Court in McNair, that the comments were valued by the jury at their true worth, as having been uttered in the heat of debate, and that they did not become factors in the formation of the jury's verdict. The jury was instructed that the sole issue before it was whether Lewis was competent to stand trial; it was also instructed that the arguments of counsel were not evidence. "`The jury is presumed to follow the instructions given by the trial court.'" Frazier v. State, 758 So.2d 577, 604 (Ala.Crim.App.), aff'd, 758 So.2d 611 (Ala.1999), cert. denied, 531 U.S. 843, 121 S.Ct. 109, 148 L.Ed.2d 66 (2000), quoting Hutcherson v. State, 727 So.2d 846, 854 (Ala.Crim.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). The prosecutor's comments did not so infect the competency trial with unfairness as to make the resulting verdict a denial of due process.

E.
Lewis also contends that the trial court erred in not defining for the jury at the competency trial the "clear and convincing" standard of proof. Although the trial court properly instructed the jury that the burden was on the State to prove Lewis's competence "by evidence that is clear and convincing" (R. 1241), the record reflects that the court did not define "clear and convincing" evidence for the jury. Lewis maintains that the failure to provide the jury with a definition of "clear and convincing" improperly "left the jury without direction as to the actual legal standard of proof required of the State." (Lewis's brief at p. 38.) Lewis did not object to the trial court's instructions in this regard; therefore, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
In support of his contention, Lewis cites Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997), in which the trial court had failed to define the term "clear and convincing" with respect to the appellant's burden of proving his defense of not guilty by reason of mental disease or defect. In Trawick, the Alabama Supreme Court held that the trial court's instructions as a whole adequately conveyed to the jury the proper burden and there was nothing that would have misled the jury as to the standard of proof that the appellant was required to meet in order to establish his defense. See also Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998) (finding no plain error in the trial court not defining the term "clear and convincing" with respect to the appellant's burden of proving his insanity defense, where it was clear, from the trial court's instructions as a *657 whole, that the jury was not misled as to the appellant's burden of proving his defense). In both Trawick and Williams the concern was that, absent a definition of "clear and convincing," the jury, which had been instructed regarding the State's burden of proving the elements of the crimes beyond a reasonable doubt, might have confused the clear-and-convincing standard with the beyond-a-reasonable-doubt standard and improperly placed a higher burden on the appellant to prove the defense of insanity. However, the concern in Trawick and Williams is not present in this case because the jury in the competency trial was never instructed on the beyond-a-reasonable-doubt standard. Moreover, as this Court noted in Williams,"[t]he words `clear and convincing' are words of such common usage and understanding that a reasonable juror would be expected to understand their meaning." 710 So.2d at 1310. We find no error, plain or otherwise, in the trial court's not defining the term "clear and convincing" for the jury at the competency trial.

F.
Finally, Lewis contends that the trial court erred in not instructing the competency jury that one of its options in rendering a verdict on his competency was that he was incompetent to stand trial and that there was no substantial probability that he would become competent in a reasonable period of time. Rule 11.6(c), Ala.R.Crim.P., provides, in part:
"(c) Orders.
"(1) If after the hearing the circuit judge or the jury does not find that the defendant is incompetent to stand trial, the criminal proceedings shall continue without unnecessary delay....
"(2) If after the hearing the judge or jury determines that the defendant is incompetent and that there is no substantial probability that the defendant will become competent within a reasonable period of time, and
"(i) if the judge or jury further determines, based on clear and convincing evidence, that the defendant's being at large poses a real and present threat of substantial harm to the defendant or to others, and that the defendant is mentally ill or has a mental defect and, if not treated, will continue to suffer mental distress and will continue to experience deterioration of the ability to function independently, and that the defendant is unable to make a rational and informed decision as to whether treatment would be desirable, the court shall order the defendant committed to the custody of the Department of Mental Health and Mental Retardation for a period not to exceed six (6) months ...; but
"(ii) if the judge or jury does not find that the threat of substantial harm referred to in the preceding subsection (c)(2)(i) exists, the court shall dismiss the charges against the defendant, either with or without prejudice to the right of the State to bring the charges again, and it shall order the defendant released forthwith.
"(3) If after the hearing the judge or the jury determines that the defendant is incompetent to stand trial, but that there is a substantial probability that the defendant will be restored to competency within a reasonable period of time, and
"(i) if the judge or the jury also determines, based on clear and convincing evidence, that the defendant's being at large poses a real and present threat of substantial harm to the defendant or to others, and that the defendant is mentally ill or has a mental defect and, if not treated, will continue *658 to suffer mental distress and will experience deterioration of the ability to function independently, and that the defendant is unable to make a rational and informed decision as to whether treatment would be desirable, the court shall order the defendant committed to the custody of the Department of Mental Health and Mental Retardation for therapy and treatment, in an institution suitable to receive such persons, for a period not to exceed six (6) months or until the defendant's earlier restoration to competency; but
"(ii) if the judge or jury does not also find that the threat of substantial harm referred to in the preceding subsection (c)(3)(i) exists, the court shall release the defendant, as provided in Rule 7.3, under such conditions as the court deems necessary to ensure that the defendant receives therapy and treatment designed to restore the defendant to competency within a reasonable period of time, and when applicable, to minimize or abate any risk of harm threatened by the defendant's being at large."
Rule 11.6(c), gives a jury three options in determining an accused's competency to stand trial. The jury can determine (1) that the accused is competent; (2) that the accused is incompetent and there is no substantial probability that he or she will become competent within a reasonable period of time; or (3) that the accused is incompetent, but there is a substantial probability that he or she can be restored to competency within a reasonable time. In this case, the trial court instructed the jury on options 1 and 3, but did not instruct the jury on option 2. Lewis maintains that by not instructing the jury on option 2, the trial court "unfairly and unconstitutionally limited a jury finding of incompetence by necessitating an additional finding of a substantial probability that Lewis would be restored to competency within a reasonable period of time." (Lewis's brief at p. 35.) Because Lewis did not object to the trial court's instructions in this regard, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
The record reflects that during the charge conference, the trial court stated that it was going to charge the jury on options 1 and 3, and it asked if either or both of the parties wanted it to charge on option 2. Lewis's attorneys specifically stated that they did not want the court to instruct the jury on option 2 because the evidence did not support such a charge.
"`"`A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.'"' Slaton v. State, 680 So.2d 879, 900 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Cr.App.1990). As we have said in applying the invited-error doctrine, ' "It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice."' Murrell v. State, 377 So.2d 1102, 1105 (Ala.Cr.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). `The invited error rule has been applied equally in capital cases and noncapital cases.' Rogers v. State, 630 So.2d 78, 84 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992), aff'd on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Cr.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. *659 denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994)."
Perkins v. State, 808 So.2d 1041, 1099 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).
"`"An invited error is waived, unless it rises to the level of plain error."' Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), quoting Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). `To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001)."
McNabb v. State, 887 So.2d 929, 983 (Ala.Crim.App.2001).
Any error in not instructing the jury on option 2 was invited by Lewis himself, and we do not believe that the error, if any, seriously affected Lewis's substantial rights or that it had an unfair prejudicial impact on the jury's deliberations so as to rise to the level of plain error. Lewis's attorneys argued to the jury that Lewis could be restored to competency within a reasonable time if he was treated with medication, and the only evidence presented at the competency trial supported that claim. Lewis's expert, although not testifying that Lewis was actually incompetent, did testify that, in her opinion, if Lewis was treated, as he had been in Massachusetts, with medication for six to eight weeks, his mental state would probably improve and his symptoms lessen. Given that there was no evidence indicating that, if the jury determined that Lewis was incompetent, Lewis could not be restored to competency within a reasonable time, and that Lewis's attorneys argued to the jury that Lewis could be restored to competency through treatment, we find no plain error in the trial court's not instructing the jury on option 2.

II.
Lewis contends that the trial court erred in consolidating the capital charges and the noncapital charges for trial. (Issue I in Lewis's brief.)
The charges against Lewis stemmed from three separate indictments. The first indictment charged Lewis with three counts of capital murder in connection with the death of Misty McGugin  murder made capital because it was committed during a kidnapping, a rape, and a robbery, or attempts thereof. The second indictment charged Lewis with the attempted murder, attempted kidnapping, attempted rape, and robbery of Stephanie Grayson. The third indictment charged Lewis with the attempted murder, attempted kidnapping, attempted rape, and robbery of Ashley Bitowf. Before trial, the State moved to consolidate the indictments for trial pursuant to Rule 13.3, Ala.R.Crim.P., arguing that the charged offenses were of the same or similar character, were based on the same conduct or otherwise connected in their commission, or were part of a common scheme or plan. Lewis objected to the consolidation, arguing that consolidation of the capital charges and the noncapital charges would prejudice him, that the offenses were not of the same or similar character, that they were based on different conduct or were otherwise disconnected in their commission, and that they could not be consolidated on the ground that they were part of a common scheme or plan because, he said, *660 his identity as the perpetrator of the offenses was not at issue. After a hearing, the trial court granted the State's motion and consolidated the charges for trial, specifically finding that "testimony concerning each of the other victims and/or cases would be admissible at the trial of each of the other cases." (R. 135.)
Rule 13.3(c), Ala.R.Crim.P., provides, in part:
"If offenses or defendants are charged in separate indictments, informations, or complaints, the court on its own initiative or on motion of either party may order that the charges be tried together or that the defendants be joined for the purposes of trial if the offenses or the defendants, as the case may be, could have been joined in a single indictment, information, or complaint."
Rule 13.3(a), Ala.R.Crim.P., provides, in part:
"Two or more offenses may be joined in an indictment, information, or complaint, if they:
"(1) Are of the same or similar character; or
"(2) Are based on the same conduct or are otherwise connected in their commission; or
"(3) Are alleged to have been part of a common scheme or plan."
Further, Rule 13.4(a), Ala.R.Crim.P., provides:
"If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires."
However, "[i]t is only the most compelling prejudice that will be sufficient to show the court abused its discretion in not granting a severance.... A mere showing of some prejudice is not enough." Ex parte Hinton, 548 So.2d 562, 566 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). Moreover, "[n]o prejudice results where ... the jury could easily have kept separate the evidence of the separate crimes." Id.
In Yelder v. State, 630 So.2d 92 (Ala.Crim.App.1991), rev'd on other grounds, 630 So.2d 107 (Ala.1993), cert. denied, 510 U.S. 1214, 114 S.Ct. 1336, 127 L.Ed.2d 684 (1994), this Court stated:
"`Joinder, and thus consolidation, is appropriate where the crimes are of similar character, meaning nearly corresponding, resembling in many respects, or having a general likeness. United States v. Werner, 620 F.2d 922, 926 (2d Cir.1980).' Ex parte Hinton, 548 So.2d 562, 566 (Ala.1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). The question is whether the offenses are of a same or similar character so that a person evaluating the crimes would believe that the offenses were committed by the same person. See King v. State, 518 So.2d 880 (Ala.Cr.App.1987). Perhaps the most important consideration is the answer to the following question: If the offense[s] were tried separately, would evidence of each offense be admissible in the trial for the other offense? See Nickerson v. State, 523 So.2d 504 (Ala.Cr.App.1987); King, supra."
630 So.2d at 96. Moreover,
"[T]he `common scheme or plan' provision of Rule 13.3 is limited by the `common scheme or plan' exception to the rule excluding collateral crimes evidence. That is, multiple offenses alleged to have been committed by the same defendant may not be consolidated and tried jointly under the `common *661 scheme or plan' provision of Rule 13.3 unless evidence of each offense would be admissible, under the `common scheme or plan' exception to the collateral crimes exclusionary rule, at a separate trial of the other offense. See King v. State, 518 So.2d [880,] 884 & n. 2 [(Ala.Crim.App.1987)]; Ex parte Hinton, 548 So.2d [562,] 566 [(Ala.1989)]."
Kennedy v. State, 640 So.2d 22, 29 (Ala.Crim.App.1993). Thus, consolidation in this case was proper only if evidence of each offense would be admissible at a separate trial of each of the other offenses.
"On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question. This rule is generally applicable whether the other crime or act was committed before or after the one for which the defendant is presently being tried....
"....
"The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted."
C. Gamble, McElroy's Alabama Evidence § 69.01(1) (5th ed.1996) (footnotes omitted). The other purposes for which collateral-crimes evidence may be admissible, i.e., the exceptions to the exclusionary rule, include:
"`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'"
Nicks v. State, 521 So.2d 1018, 1026 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), quoting Nelson v. State, 511 So.2d 225, 233 (Ala.Crim.App.1986), aff'd, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). These exceptions do not apply unless "there is a real and open issue as to one or more of those `other purposes.'" Bowden v. State, 538 So.2d 1226, 1227 (Ala.1988). Furthermore, the common plan, scheme, or design exception is "essentially coextensive with the identity exception," Ex parte Darby, 516 So.2d 786, 789 (Ala.1987), and "applies only when identity is actually at issue." Campbell v. State, 718 So.2d 123, 128-29 (Ala.Crim.App.1997), cert. denied, 525 U.S. 1006, 119 S.Ct. 522, 142 L.Ed.2d 433 (1998). See also Clemons v. State, 720 So.2d 961 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999).
The consolidation of the noncapital offenses and the capital offenses in this case was proper because the crimes were of a similar character and because evidence of each crime would have been admissible in a trial for the others as evidence *662 of a common plan, scheme, or design, of Lewis's intent, and of Lewis's motive. The crimes were similar in that each occurred in Baldwin County near where Lewis lived; each involved a young female victim with brown hair; each involved a murder, robbery, rape, and kidnapping or an attempt thereof; and, in each case, Lewis used or planned to use a knife. Each crime would have been admissible in the trial of the others as evidence of a common plan, scheme, or design  to kidnap, rape, rob, and murder young women with brown hair who resembled and/or reminded Lewis of his ex-wife Lena  and of Lewis's intent and motive. See, e.g., cases holding that evidence of collateral crimes was admissible to show a common plan, scheme, or design: Clemons, supra; Akin v. State, 698 So.2d 228 (Ala.Crim.App.1996), cert. denied, 698 So.2d 238 (Ala.1997); Howell v. State, 627 So.2d 1134 (Ala.Crim.App.1993); Baker v. State, 588 So.2d 945 (Ala.Crim.App.1991); and cases holding that evidence of collateral crimes was admissible to show motive and intent: Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___ (Ala.Crim.App.2001); Presley v. State, 770 So.2d 104 (Ala.Crim.App.1999), aff'd, 770 So.2d 114 (Ala.), cert. denied, 531 U.S. 881, 121 S.Ct. 194, 148 L.Ed.2d 135 (2000); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
We note that Lewis argues that the common plan, scheme, or design exception to the exclusionary rule was not applicable in his case because, he says, his identity as the person who murdered Misty McGugin was not at issue. However, our review of the record reveals that Lewis's identity was, in fact, a central issue in the case. Although Lewis initially pleaded not guilty and not guilty by reason of mental disease or defect, as noted in our statement of facts, Lewis did not pursue insanity as his main defense at trial. Rather, through cross-examination of State witnesses, presentation of evidence, and argument to the jury, Lewis asserted that he did not kill McGugin, but that Mark Evans killed her, thereby placing his identity in issue.
We find no error in the trial court's consolidating the capital and noncapital charges for trial.

III.
Lewis contends that the trial court erred when it informed the jury in the guilt and sentencing phases of the trial that it would only hear the case if a separate jury found Lewis competent to stand trial. (Issue II in Lewis's brief.) Because Lewis did not raise this claim in the trial court, we review it only for plain error. See Rule 45A, Ala.R.App.P.
The record reflects that the jury venire was separated into six panels for voir dire examination. The competency jury was selected from two of the panels and the guilt-phase/sentencing-phase jury was selected from the remaining four panels. Before voir dire, prospective jurors were informed that two separate juries would be selected. After the two juries were selected and the oath was administered, the competency jury was given a short recess, and the trial court instructed the guilt-phase/sentencing-phase jury as follows:
"Ladies and gentlemen of this jury, as you know, you have been selected to be jurors in the trial on the merits of this case. You will be called upon to perform that responsibility only if this other jury determines that Mr. Lewis is in fact competent to stand trial. That is, *663 the first decision will be a competency trial and the jury that sits in the jury box will deal with that issue. You will not be involved in that issue at all.
"I anticipate that that trial will be concluded today. And so, we will know one way or the other whether your services will be necessary. For that reason, I'm going to ask that you plan to report in the morning at 8:30. I'm going to ask that you call the telephone number that Ms. Calhoun gave you on Monday after five o'clock, so that if we need to give you some different instructions, either say don't come at all or don't come until noon tomorrow or whatever message we might give you, we will be able to give that to you at that time."
(R. 856-57.) (Portion of instruction complained of by Lewis emphasized.)
Lewis argues that informing the guilt-phase/sentencing-phase jury that it would be called to duty only if Lewis was determined to be competent to stand trial by another jury was improper because, he says, it had the ultimate effect of letting the jury know, when it was called to hear the case, that Lewis had been found competent to stand trial. According to Lewis, the trial court's statement was the equivalent of admitting evidence indicating that he had been found competent to stand trial; he argues that, under Rule 11.2, Ala.R.Crim.P., a finding of competence is inadmissible in a trial on the merits where the defense of insanity is asserted because it creates a danger that the jury determining the merits of the case will mistakenly use a finding of competence to negate the defense of insanity.
Rule 11.2, Ala.R.Crim.P., provides, in pertinent part:
"(a) Motions.
"(1) Competency to Stand Trial. When a person charged with a crime is before a circuit court, the defendant, the defendant's attorney, or the district attorney may petition for, or the court on its own motion may order, an examination to assist in the determination of the defendant's present mental condition and competency to stand trial.
"....
"(b) Admissibility of Mental Examinations.
"(1) The results of examinations conducted pursuant to subsection (a)(1) of this rule, Rule 11.3, or Rule 11.4 on the defendant's mental competency to stand trial shall not be admissible as evidence in a trial for the offense charged and shall not prejudice the defendant in entering a plea of not guilty by reason of mental disease or defect."
Clearly, the trial court's instruction in this case does not fall within the plain language of Rule 11.2(b)(1), which prohibits only the introduction of the results of competency examinations. However, as Lewis points out in his brief to this Court, the Committee Comments to Rule 11 are much broader than the rule itself. The Comments provide, in pertinent part:
"Subsection (b)(1), which is similar to Rule 12.2(c), Fed.R.Crim.P., and 18 U.S.C. § 4241, makes it clear that the determination of the defendant's competency to stand trial is separate and distinct from the determination of his sanity at the time of the offense. To ensure this factual distinction and to avoid any prejudice to the defendant, the finding of the defendant's competency to stand trial is specifically made inadmissible in the trial for the offense charged."
(Emphasis added.)
The Comments indicate that any finding of competency, not just the results of competency examinations by experts, is inadmissible under Rule 11.2 in a trial for the offense charged, although the rule itself *664 prohibits only the admission of results of competency examinations. The Comments also indicate that Rule 11.2(b)(1) is similar to Rule 12.2(c), Fed.R.Crim.P., and 18 U.S.C. § 4241. However, neither Rule 12.2(c), Fed.R.Crim.P., nor 18 U.S.C. § 4241 prohibit the admission of the results of competency examinations, as Rule 11.2(b)(1) does. Rule 12.2(c), Fed.R.Crim.P., provides:
"In an appropriate case the court may, upon motion of the attorney for the government, order the defendant to submit to an examination pursuant to 18 U.S.C. §§ 4241 [dealing with competency examinations] or 4242 [dealing with examinations to determine mental state at the time of the crimes]. No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced testimony."
This is similar to Rule 11.2(b)(2), Ala.R.Crim.P., which allows admission of the results of mental examinations conducted to determine a defendant's mental state at the time of the offense, but provides that "no statement made by the defendant during the course of the examination, no testimony by an examining psychiatrist or psychologist based upon such a statement, and no other evidence directly derived from the defendant's statement shall be admitted against the defendant in any criminal proceeding, except on an issue respecting mental condition on which the defendant has testified." However, it is not similar to Rule 11.2(b)(1), which prohibits the admission of the results of competency examinations, not the admission of statements by a defendant made during the course of the competency examination. Moreover, 18 U.S.C. § 4241(f) provides: "A finding by the court that the defendant is mentally competent to stand trial shall not prejudice the defendant in raising the issue of his insanity as a defense to the offense charged, and shall not be admissible as evidence in a trial for the offense charged." Unlike Rule 11.2(b)(1), § 4241 expressly prohibits the admission of a finding of competency by a court, but it does not prohibit the admission of the results of competency examinations. See, e.g., United States v. Vazquez-Pulido, 155 F.3d 1213, 1217 (10th Cir.), cert. denied, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 356 (1998) (holding that the admission of the results of various tests administered to the defendant as part of a competency evaluation was not error and refusing to adopt a per se rule making all test results from competency evaluations inadmissible because "the statutory scheme does not forbid the use of competency tests at trial"); United States v. Santos, 131 F.3d 16, 20 (1st Cir.1997) (finding no prejudice in the admission of a psychologist's testimony that he believed the defendant was competent to stand trial and noting that a court's finding of competency is all that is prohibited by § 4241); United States v. Hutson, 821 F.2d 1015, 1019 (5th Cir.1987) (holding that admission of testimony that defendant had been evaluated by a psychiatrist before trial and found to be competent was not error because "the exclusionary rule of section 4244, the predecessor of section 4241(f), applies only to findings by the trial judge"); and United States v. Fortune, 513 F.2d 883, 888-89 (5th Cir.), cert. denied, 423 U.S. 1020, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975) (holding that references during trial to pretrial competency evaluations did not violate § 4244, the predecessor to § 4241(f), where the trial court's finding of *665 competence was not introduced into evidence). Clearly, contrary to the Committee Comments, Rule 11.2(b)(1) is not similar to either Rule 12.2(c), Fed.R.Crim.P., or 18 U.S.C. § 4241.
Thus, as the State correctly points out in its brief to this Court, we are faced with a situation in which the Committee Comments to Rule 11.2 are inconsistent with the plain language of the rule itself. In addressing a similar situation in J.W. v. State, 751 So.2d 529 (Ala.Crim.App.1999), in which a rule of procedure conflicted with the comments to the rule, this Court stated:
"Rule 11(A), Ala.R.Juv.P., is a rule of procedure: it outlines the procedure that must be followed by a police officer who has taken a juvenile into custody. We have previously held that when interpreting a rule of procedure, we must give the wording of the rule its plain meaning. See Ex parte City of Montgomery, 721 So.2d 261, 262 (Ala.Cr.App.1998) (interpreting Rule 30.5(b), Ala.R.Crim.P.). There is no wording in Rule 11(A) that requires the person taking the child into custody to inform the child of the right to contact his parents or a lawyer immediately when the child is taken into custody. The rule says `When a child is taken into custody,' not `at the moment the child is taken into custody' or `immediately upon being taken into custody.' The Comment following Rule 11(A), Ala.R.Juv.P., does, however, say that the rights must be given `as soon as the child is taken into custody.' Thus, there is a discrepancy between the plain language of the rule and the Comment to the rule. The Supreme Court has previously addressed this issue when it interpreted a conflict between a rule of civil procedure and the comments following the rule. See Ex parte Anderson, 644 So.2d 961, 963 (Ala.1994) (interpreting Rule 27, Ala.R.Civ.P.). The Court held that a statement in the comments to a rule of civil procedure does not take precedence over the plain language of the rule. See id. This same principle applies to the Rules of Juvenile Procedure. Because the clear language does not contain wording that requires an immediate reading of rights when a child is taken into custody, we will not interpret the rule to require such immediacy."
751 So.2d at 531-32.
Similarly, here, nothing in the plain language of Rule 11.2(b)(1) prohibits the admission of a finding of competency by a jury or by a trial court in a trial on the merits. Rule 11.2(b)(1) is clear on its face, and we cannot interpret it to prohibit something other than that which it prohibits by its plain language  the admission of results of competency examinations. Therefore, we find no error, plain or otherwise, in the trial court's statement informing the guilt-phase/sentencing-phase jury that it would be called to duty only if Lewis was determined to be competent to stand trial by another jury.
Moreover, even if we were to assume that the comments to Rule 11.2 should take precedence over the plain language of the rule and that the trial court's statement was, therefore, error, we would find that the error was harmless. Rule 45, Ala.R.App.P., provides, in part:
"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury ... unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
*666 "The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless." Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001), citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
"After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]; Sattari v. State, 577 So.2d 535 (Ala.Cr.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); [Ala.]R.App.P. 45. Moreover, the harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence. In order for a nonconstitutional error to be deemed harmless, the appellate court must determine with `fair assurance... that the judgment was not substantially swayed by the error.' Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Vines v. United States, 28 F.3d 1123, 1130 (11th Cir.1994).... In order for the error to be deemed harmless under Ala.R.App.P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights.... The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing."
Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999).
The apparent purpose behind the prohibition in Rule 11.2, and the suggested prohibition in the Committee Comments to that rule, is to prevent a jury from confusing a defendant's competence to stand trial with his sanity at the time of the offense and from using a defendant's competence to negate his insanity defense. Competency to stand trial deals with a defendant's "present ability" to assist in his or her defense, Rule 11.1, Ala.R.Crim.P., while sanity deals with a defendant's mental state "at the time of the commission of the acts constituting the offense," § 13A-3-1(a), Ala.Code 1975. Rule 11.2(b)(1), in expressly prohibiting the admission of the results of competency examinations during the trial of the offense charged, specifically provides that those results "shall not prejudice the defendant in entering a plea of not guilty by reason of mental disease or defect." (Emphasis added.) The Committee Comments, stating that any finding of competency is inadmissible during the trial of the offense charged, provide that the purpose of the rule is to ensure the factual distinction between competency to stand trial and sanity at the time of the offense so as "to avoid any prejudice to the defendant." (Emphasis added.)
After reviewing the entire record, we do not believe that the guilt-phase/sentencing-phase jury was confused as to the distinction between Lewis's competence to stand *667 trial and his sanity at the time of the crimes or that it used Lewis's competence to negate the insanity defense. The trial court's statement was made just before the competency trial began, a day before the guilt phase of the trial began, and seven days before the jury retired to deliberate at the conclusion of the guilt phase. When it made the statement, the trial court specifically told the guilt-phase/sentencing-phase jury that it would not be involved "at all" in determining Lewis's competency to stand trial. Yet during its instructions at the conclusion of the guilt phase of the trial, the trial court instructed the jury that Lewis had asserted the defense of not guilty by reason of mental disease or defect and specifically told the jury that the question whether Lewis was, in fact, suffering from a mental disease or defect at the time of the crimes was for the jury to determine. The trial court also stated, on four different occasions during its instructions on mental disease or defect, that the defense applied to the time of the commission of the crimes. In addition, there was no evidence presented during the guilt phase of the trial indicating that Lewis was, in fact, suffering from a mental disease or defect at the time of the crimes. The State's expert testified that Lewis was sane at the time of the crimes and Lewis's own expert testified that she could not give a "definitive opinion" as to his mental state at the time of the crimes. Finally, as noted above in the statement of facts, Lewis's main defense during the guilt phase of the trial was not that he was suffering from a mental disease or defect at the time of the crimes, but, rather, that he did not murder McGugin and that the jury should not believe his confession to the murder because he was suffering from a mental disease or defect when he confessed.
Although not argued by Lewis, we note that we also do not believe that the guilt-phase/sentencing-phase jury used Lewis's competence to stand trial to negate his claim at trial that his confession should not be believed because it was the result of mental disease. The trial court specifically instructed the guilt-phase/sentencing-phase jury that although the court had previously determined the voluntariness of Lewis's confession, the weight and credibility of that confession was solely for the jury to determine, and also that the jury could "disregard the alleged statements which [it found] to be unworthy of belief or of which [it] entertain[ed] a reasonable doubt as to the truth of the [ ] statements." (R. 2339.) There was no evidence at trial indicating that Lewis was suffering from a mental disease or defect at the time of his confession, but there was evidence at trial that corroborated Lewis's confession and, thus, that strongly indicated that Lewis was not suffering from a mental disease or defect at the time of his confession. Not only did Lewis lead police to the location of McGugin's remains in a remote part of the woods, his DNA was found on a cigarette butt in McGugin's car.
Under these circumstances, we do not believe that the trial court's informing the guilt-phase/sentencing-phase jury that it would be called to duty only if another jury determined that Lewis was competent to stand trial confused the jury as to the distinction between competence and sanity, resulted in the jury's using Lewis's competence to negate the insanity defense or his claim that he was insane at the time he confessed, contributed to the jury's guilty verdict, or prejudiced Lewis in any way. Therefore, we conclude that any error in this regard was harmless.

IV.
Lewis contends that the trial court erred in admitting into evidence nuclear-DNA matching evidence and population-frequency-statistical *668 evidence and mtDNA matching evidence and population-frequency-statistical evidence because, he says, the State failed to lay the proper predicate for admission of the evidence. (Issues V and VI in Lewis's brief.)
Before trial, Lewis requested a hearing outside the presence of the jury to determine the admissibility of all of the DNA evidence the State was intending to introduce. (C. 77.) The record reflects that no hearing was held regarding the admissibility of the nuclear-DNA evidence and that Lewis did not object when the State introduced that evidence. A hearing was held outside the presence of the jury regarding the admissibility of the mtDNA evidence, after which the trial court found the evidence to be admissible. However, Lewis did not object to this finding nor did he object when the State sought to introduce the mtDNA evidence. Therefore, Lewis's claims regarding both the nuclear-DNA evidence and the mtDNA evidence will be reviewed only for plain error. See Rule 45A, Ala.R.App.P.
Before addressing the admissibility of the DNA evidence, a brief explanation of DNA and of the types of DNA evidence introduced in the present case is in order.[13] DNA, or deoxyribonucleic acid, is, essentially, the molecule that determines who an individual is; it is contained in almost every cell in the human body. Two types of DNA are found in a cell: nuclear DNA and mtDNA. Nuclear DNA is found in the nucleus of the cell and mtDNA is found in the outer layer of the cell in the mitochondria. All DNA is composed of two strands that come together to form a ladder-shaped molecule. The nuclear-DNA molecule is twisted and looks like a spiral staircase, while the mtDNA molecule is circular, as if the ends of the ladder have been joined. The rungs of this "ladder" are composed of pairs of four different base chemicals ("bases"), abbreviated as A, T, C, and G. On any given rung of the "ladder," bases A and T are always paired together and bases C and G are always paired together; the order in which these pairs of bases ("base pairs") occur, i.e., the sequence, is the subject of mtDNA analysis. Nuclear DNA contains approximately three billion base pairs, while mtDNA contains 16,569 base pairs. Because of the number of base pairs in a DNA molecule, analysis of the whole molecule is not practical. Therefore, when testing DNA, scientists look only at certain regions, or loci, of the entire DNA molecule  those regions that have been determined to vary greatly among individuals.[14] The size of these regions is the subject of nuclear-DNA analysis. Only two copies of nuclear DNA are contained in a cell; however, there are anywhere from 10 to over 1,000 copies of mtDNA in a cell. Because of the many copies of mtDNA in a cell, mtDNA testing is possible when nuclear-DNA testing is not, i.e., on biological samples that are extremely small or degraded. In addition, nuclear DNA is inherited from both parents so it is unique to each individual (except identical twins), while mtDNA is maternally inherited and, therefore, is not unique to an individual (i.e., all siblings have the same mtDNA as their mother).
Like there are two types of DNA in a cell, there are two types of DNA evidence: matching evidence and population-frequency-statistical *669 evidence. In terms of criminal law, matching evidence indicates whether the DNA from a given sample (such as a sample of biological fluid from a crime scene) is the same as a suspect's DNA. If the DNA is not the same, then the suspect is excluded as having contributed that sample to the crime scene. If the DNA is the same, then the suspect is included as having possibly contributed that sample to the crime scene; however, the suspect is not positively identified as the contributor to the sample. Because only certain regions of the DNA molecule are analyzed and used for comparison, rather than the whole molecule, it is possible that more than one person has the same sequence in the same region (mtDNA) or the same size region (nuclear DNA). Because a "match" is not, by itself, a positive identification of an individual, the significance of that match must be calculated. Population-frequency-statistical evidence is evidence of the frequency with which a particular sequence or size in a particular region is found in the population as a whole and it establishes the significance of the matching evidence.
The standard for the admissibility of DNA evidence, both nuclear-DNA and mtDNA matching evidence and population-frequency-statistical evidence, is found in § 36-18-30, Ala.Code 1975; that section provides:
"Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et. ux., et. al., v. Merrell Dow Pharmaceuticals, Inc., decided on June 28, 1993."
In Turner v. State, 746 So.2d 355 (Ala.1998), the Alabama Supreme Court explained the test for the admissibility of DNA evidence as set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as follows:
"In Daubert, 509 U.S. at 589, 113 S.Ct. at 2794-95, the Supreme Court concluded that Rule 702, Fed.R.Evid., displaced the Frye [v. United States, 293 F. 1013 (D.C.Cir.1923)] standard. The Court stated:
"`Frye made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials.
"`....
"`... [U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'
"Daubert, 509 U.S. at 589, 113 S.Ct. at 2794-95 (emphasis added). Thus, if scientific evidence passes the two-pronged test of Daubert  reliability and relevance  it will be admissible and the jury will determine the appropriate weight to give that evidence.
"The `reliability' prong of the Daubert admissibility test requires the party proffering the scientific evidence to establish that the evidence constitutes `scientific knowledge.' Daubert, 509 U.S. at 590, 113 S.Ct. at 2795. The evidence need not represent immutable scientific fact, but, rather, it must be derived by use of the `scientific method.' Id. The trial court should focus its inquiry on the expert's `principles and methodology, not on the conclusions that they generate.' Id. at 595, 113 S.Ct. at 2797. Thus, the reliability inquiry should address *670 the `scientific validity' of the principle asserted, that is, whether the `principle support[s] what it purports to show.' Daubert, 509 U.S. at 590 n. 9, 113 S.Ct. at 2795 n. 9.
"In assessing reliability, trial courts should look to several guiding factors, including: (1) whether the `theory or technique... has been ... tested'; (2) whether the `theory or technique has been subjected to peer review and publication'; (3) whether the technique's `known or potential rate of error ... and... standards controlling the technique's operation' are acceptable; and (4) whether the theory or technique has gained `general acceptance' in the relevant scientific community. Id. at 593-94, 113 S.Ct. at 2796-97.
"The `relevance' prong of the Daubert admissibility test requires the party proffering the scientific evidence to establish that the evidence `assist [s] the trier of fact to understand the evidence or to determine a fact in issue.' Daubert, 509 U.S. at 591, 113 S.Ct. at 2796 (quoting Rule 702, Fed.R.Evid.). The trial court should focus on the connection between the proffered scientific evidence and the factual issues. Id. at 591-92, 113 S.Ct. at 2795-96. Thus, the relevance inquiry should address the `fit' between what the scientific principles and methods are supposed to show and what must be shown to resolve the factual dispute at trial. Id.

"....
"... Under Daubert, a party's challenge to the performance of a reliable and relevant scientific technique in a particular case should warrant exclusion of the scientific evidence only if the '"reliable methodology was so altered ... as to skew the methodology itself."' [United States v. Beasley, 102 F.3d 1440, 1448 (8th Cir.1996), cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997)] (quoting United States v. Martinez, 3 F.3d 1191, 1198 (8th Cir.1993), cert. denied, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994)).
"We hold that if the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to § 36-18-30, determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
"I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based `reliable'?
"II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based `relevant' to understanding the evidence or to determining a fact in issue?
"Trial courts should use the flexible Daubert analysis in making the `reliability' (scientific validity) assessment. In making that assessment, the courts should employ the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance.
"Trial courts should make the `relevance' assessment by addressing the `fit' between what the scientific theory and technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined the reliability of the technique, will evidence *671 that is otherwise reliable and relevant be deemed inadmissible."
746 So.2d at 358-61 (footnotes omitted). With these standards in mind, we address each of Lewis's arguments in turn.

A.
First, Lewis contends that the trial court erred in admitting into evidence the results of nuclear-DNA testing on the cigarette butts found in McGugin's car. Specifically, he maintains that the State failed to present sufficient evidence indicating that the theory and techniques used by the Alabama Department of Forensic Sciences in producing both the nuclear DNA matching evidence and the nuclear DNA population-frequency-statistical evidence were "reliable" under Daubert.[15]
Sarah Elaine Scott, a forensic biologist with the Alabama Department of Forensic Sciences who was accepted without objection as an expert in nuclear-DNA analysis, testified that she performed nuclear-DNA testing on cigarette butts found in McGugin's car and on the piece of carpet from room 18 in Woody's Motel. Scott stated that the DNA sequence on one of the cigarette butts "matched" Lewis's DNA on 10 different loci and that the same DNA would be found in only 1 in 2,320,000 Caucasians[16] and 1 in 11,100,000,000 African-Americans. The nuclear-DNA testing on the carpet, Scott said, showed that the blood on the carpet came from a female. However, Scott stated that because she did not have any nuclear DNA from Misty McGugin, she could not determine whether the blood on the carpet was McGugin's.
Scott testified that she used a four-step process to perform the nuclear-DNA testing. First, Scott extracted the DNA from the samples. Second, she performed a "swat blot test or a quantitation" in order to determine whether she had enough DNA to perform further testing. (R. 1884.) Once she determined that she had enough DNA to continue testing, Scott said, she then took 11 regions of the DNA (DQ Alpha, LDLR, GYPA, HBGG, D7S8, GC, D1S80, CSF1PO, TPOX, AME, and THO1) she wanted to examine and made copies of those regions through an "amplification process" so that she could see those regions with her instruments. (R. 1885.) After the amplification was complete, Scott put the different DNA regions in a "jell apparatus," which, through a process called "electrophoresis," forced the different regions to migrate based on their sizes. (R. 1885.) According to Scott, the size of the DNA in the different regions, or loci, differentiates one individual from the next, and a comparison can then be made. Scott testified that controls are used throughout the testing process, including testing known DNA samples to make sure the procedure and technique gets the correct results, and that there was no indication of error in the testing process in this case. Scott also testified that the testing procedure she used has been scientifically validated through numerous trials; that it is commonly used in the scientific and medical communities; that it is generally accepted in the scientific community; that it has been specifically accepted in the state of Alabama; that it has been found to be reliable and valid by courts in Alabama; that it has been approved by the DNA advisory board, a board set up by the federal government to monitor DNA testing, by the Scientific Working Group on DNA Analysis Methods ("SWGDAM"), *672 a peer group of scientists in the field of DNA testing, and by a national regulatory commission which she referred to as a "blue ribbon panel" of experts (R. 1887); and that it has been subject to publication, specifically a "N.R.C." report examining the reliability of DNA testing.
Scott testified that once she finds a "match" between DNA samples, she must perform a statistical analysis, which she referred to as the "multiplication rule," to determine the significance of that "match," i.e., to determine the frequency of the particular DNA profile in the population. (R. 1889.) In calculating this frequency, Scott said, she used the Alabama database containing DNA samples from approximately 150 African-Americans and 150 Caucasians. Scott stated that when the Alabama Department of Forensic Sciences first began using the Alabama database it also routinely used a nationwide database from the Federal Bureau of Investigation to make sure the Alabama database would yield the same results. When the results were the same using both the Alabama database and the nationwide database, Scott said, the Department ceased using the nationwide database. Scott also said that the database had been examined by a population genetics expert in Texas.[17] She stated that the statistical analysis she used was a method routinely used in forensic labs and that it is generally accepted in the scientific community. In addition, she said that controls are in place to ensure the accuracy of the statistical analysis, including two scientists' performing the same analysis independently. According to Scott, there were no indications that any error occurred in the statistical analysis.
Scott's testimony was sufficient to establish the reliability prong of the Daubert test as to both the matching evidence and the population-frequency-statistical evidence. Scott testified to testing, peer review, publication, controls, and general acceptance in the scientific community. Although she did not testify to the "known or potential rate of error" of either the DNA testing or of the statistical analysis, the rate of error is but one factor to be considered in determining the admissibility of DNA evidence and, contrary to Lewis's contention, the absence of testimony regarding this factor will not, alone, render DNA evidence inadmissible. See, e.g., Ex parte Taylor, 825 So.2d 769 (Ala.2002) (testimony as to testing, peer review, controls, and acceptance in the scientific community was sufficient to satisfy the Daubert reliability test for admissibility of DNA testing). Moreover, we reject Lewis's argument that because Scott did not state the name of the statistical analysis she used  i.e., she did not state that she used the "product rule" which, Lewis concedes, has been held to be reliable under Daubert  that the population-frequency-statistical evidence was inadmissible. As this Court stated in Broadnax v. State, 825 So.2d 134, 174 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002), "[t]he failure of testimony to name the DNA method used goes to the weight of the evidence, not its admissibility."
We find no error, plain or otherwise, in the admission of the nuclear DNA matching evidence and the nuclear DNA population-frequency-statistical evidence.

B.
Second, Lewis contends that the trial court erred in admitting into evidence the results of mtDNA testing on the bloodstained carpet from room 18 of Woody's Motel and from the hair identified as coming from the remains of Misty McGugin. *673 He maintains that the State failed to present sufficient evidence indicating that the theory and techniques used by the Federal Bureau of Investigation in producing both the mtDNA matching evidence and the mtDNA population-frequency-statistical evidence were "reliable" under Daubert.[18] Although nuclear-DNA evidence (both matching evidence and population-frequency-statistical evidence) has been accepted in Alabama courts on numerous occasions, the admissibility of mtDNA evidence has not yet been addressed.
Alice Isenberg, a forensic examiner with the Federal Bureau of Investigation who testified as an expert in mtDNA analysis, testified that she performed mtDNA testing on a bloodstain on a piece of carpet from Woody's Motel, on a piece of hair identified as coming from McGugin, and on a blood sample from Lewis. Isenberg stated that the DNA from the carpet did not match Lewis's DNA, but it did match the DNA from McGugin's hair. She stated that only 0.2 percent of the Caucasian population would have the same DNA.
As to the procedures she used in this case, Isenberg testified that the first step in mtDNA testing is to extract the DNA from the sample and to purify it. The second step is to copy the DNA or "amplify" it so that it is visible with the instruments in the lab. The technique used to amplify the DNA is called "polymerase chain reaction," which Isenberg described as a "molecular xeroxing technique" using chemicals. (R. 1410.) The third step is to examine the DNA and determine the order of the chemicals, or bases, that make up the DNA. The fourth step is to compare the order of the bases, i.e., the sequence, to other samples to determine if there is a "match." If there is a "match," then that sequence is compared to a database of DNA samples to determine how often that particular sequence is found in the database and a statistical analysis using a mathematical formula that has been generally accepted in the scientific community is then performed to determine the frequency of that sequence in the general population.
Isenberg testified that there are several controls in place during the process to ensure the accuracy of the tests; she described each of those controls; and she stated that the controls indicated that no error had occurred during the testing process in this case. In addition, Isenberg testified that mtDNA testing is used extensively in medicine and anthropology; that it has been approved by SWGDAM and by the DNA Review Board, both of which have issued guidelines regarding mtDNA testing which her laboratory follows; that each laboratory that wants to begin mtDNA testing must perform and publish a validation study, which her laboratory did in 1995; that mtDNA testing is generally accepted in the scientific community; and that mtDNA evidence has been accepted as reliable in approximately 20 courts in the United States, including federal court in Mobile, Alabama, and an Alabama state court in Perry County. In addition, Isenberg testified that in calculating the population frequency statistics, she used the SWGDAM database, which had been extensively reviewed by a population geneticist employed by the FBI; that the method she used for calculating the statistics is generally accepted in the scientific community; that the method has a margin of error that is incorporated into the analysis so that the estimate is conservative; and that the controls she had previously *674 explained were used to calculate the statistics and showed that no error had occurred.
Isenberg's testimony was sufficient to establish the reliability prong of the Daubert test as to both the matching evidence and the population-frequency-statistical evidence. Isenberg testified to testing, peer review, publication, controls, and general acceptance in the scientific community. Again, as with the nuclear DNA evidence, although Isenberg did not testify to the "known or potential rate of error" of the DNA matching evidence,[19] the rate of error is but one factor to be considered in determining the admissibility of DNA evidence and, as noted above, the absence of testimony regarding this factor will not, alone, render DNA evidence inadmissible.
We find no error, plain or otherwise, in the admission of the mtDNA matching evidence and population-frequency-statistical evidence.

V.
Lewis contends that the evidence was insufficient to sustain his three capital-murder convictions and his eight noncapital convictions. (Issues IV and X in Lewis's brief.)

A.
Lewis contends that the evidence was insufficient to sustain his convictions for three counts of capital murder because, he says, the State failed to prove a prima facie case independent of his confessions. Specifically, Lewis argues:
"Other than the detailed statement provided to law enforcement authorities by [him], there was no evidence direct or circumstantial, presented to sustain a finding that the murder of Misty McGugin had been committed by him during the course of a robbery, kidnapping, or rape, or during the attempted commission of any of those three offenses. Because of the lack of sufficient evidence that the murder of Misty McGugin was a capital murder committed during a rape, robbery, or kidnapping, [his] capital murder convictions are due to be reversed."
(Lewis's brief at pp. 40-41.)
Although Lewis cites law regarding the State's burden of proving the corpus delicti of an offense independent of an accused's confession, Lewis's argument is not that the State failed to prove the corpus delicti of the capital offenses independent of his confessions or that the evidence as a whole (including his confessions) was insufficient to sustain his convictions. Rather, Lewis's argument is that, absent his confessions, there was insufficient evidence of the capital offenses. However, contrary to Lewis's contention, the State was not required to prove a prima facie case of the capital offenses independent of his confessions; the State was only required to prove the corpus delicti of the offenses independent of his confessions. Therefore, Lewis's argument that his capital-murder convictions should be reversed because there was insufficient evidence to sustain the convictions independent of his confessions is meritless.
However, because this is a case in which the death penalty has been imposed and plain-error review is applicable, we have *675 reviewed the record, and we conclude that the State sufficiently proved the corpus delicti of the capital offenses independent of Lewis's confessions and that the evidence as a whole was sufficient to sustain the convictions.
In Maxwell v. State, 828 So.2d 347 (Ala.Crim.App.2000), cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002), this Court stated the following regarding the State's burden of proving the corpus delicti of a crime independent of an accused's confession:
"It has been the rule in Alabama that the State must offer independent proof of the corpus delicti of the charged offense to authorize the admission of a defendant's confession or inculpatory statement. Robinson v. State, 560 So.2d 1130, 1135-36 (Ala.Cr.App.1989); see C. Gamble, McElroy's Alabama Evidence, 200.13 (5th ed.1996). '"The corpus delicti consists of two elements: '(1) That a certain result has been produced, ... and (2) that some person is criminally responsible for the act.'" Johnson [v. State, 473 So.2d 607, 608 (Ala.Cr.App.1985),] (quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (3d ed.1977)).' Spear v. State, 508 So.2d 306, 308 (Ala.Cr.App.1987). '"Positive, direct evidence of the corpus delicti is not indispensable to the admissions of confessions."' Bracewell v. State, 506 So.2d 354, 360 (Ala.Cr.App.1986), quoting Ryan v. State, 100 Ala. 94, 14 So. 868 (1894). `The corpus delicti may be established by circumstantial evidence.' Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).
"`"Independent evidence of the corpus delicti need not be of such probative strength as that such evidence, standing alone, in the opinion of the trial or appellate court, would, ought to or probably would satisfy a jury beyond a reasonable doubt of the existence of the corpus delicti. Independent evidence of the corpus delicti may consist solely of circumstantial evidence. Whether the independent evidence tending to prove the corpus delicti is sufficient to warrant a reasonable inference of the existence thereof depends, of course, upon the particular facts of each case."'
"Bush v. State, 695 So.2d 70, 117 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (4th ed.1991) (footnotes omitted in Bush); see also Howell v. State, 571 So.2d 396 (Ala.Cr.App.1990). `The presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of the question to the jury.' Watters v. State, 369 So.2d 1262, 1272 (Ala.Cr.App.1978), rev'd on other grounds, 369 So.2d 1272 (Ala.1979).
"Further, it is well settled that
"`"inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti."'
"Bush, 695 So.2d at 117-18, quoting Bridges v. State, 284 Ala. 412, 417, 225 So.2d 821, 826 (1969); see also Bracewell, 506 So.2d at 360; Spear, 508 So.2d at 308. `While a confession is inadmissible as prima facie proof of the corpus delicti, it can be used along with other evidence to satisfy the jury of the existence *676 of the corpus delicti.' Bracewell, supra at 360; see also Howell, 571 So.2d at 397. As Professor Gamble has observed:
"`The purpose of requiring proof of the corpus delicti, as a condition precedent to the admission of a confession, is to insure its trustworthiness. For this reason, there is some judicial language to the effect that corroborative evidence independent of the confession need not be sufficient to establish corpus delicti but must be sufficient independent evidence which would tend to establish the trustworthiness of the confession.'
"McElroy's Alabama Evidence, § 200.13 at 100 (5th ed.1996). Finally, we have held:
"`"Evidence of facts and circumstances, attending the particular offense, and usually attending the commission of similar offenses  or of facts to the discovery of which the confession has led, and which would not probably have existed if the offense had not been committed  would be admissible to corroborate the confession. The weight which would be accorded them, when connected with the confession, the jury must determine, under proper instructions from the court."'
"Bush, supra at 118, quoting Matthews v. State, 55 Ala. 187, 194 (1876); see also Bracewell, supra."
828 So.2d at 357-58. "The term corpus delicti means the body or the substance of the crime and connotes the commission of the offense by the criminal agency of someone." Tanner v. State, 57 Ala.App. 254, 264, 327 So.2d 749, 759 (1976). "Proof of the corpus delicti does not necessarily include evidence connecting [the] defendant with the crime." Arnold v. State, 57 Ala.App. 172, 173, 326 So.2d 700, 701 (1976). See also C. Gamble, McElroy's Alabama Evidence, § 304.01 (5th ed.1996) ("the term corpus delicti does not mean or include the guilty agency of the accused in the commission of the charged crime").
In this case, the State presented sufficient evidence to raise a "`reasonable inference of the existence of the corpus delicti'" of capital murder during a kidnapping, rape, and robbery. Bush v. State, 695 So.2d 70, 117 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (4th ed. 1991). The State presented evidence indicating that on the night of January 31, 1998, Misty McGugin went to room 18 at Woody's Motel to meet a client and that, after she arrived, she telephoned her employer to say that she had arrived and that everything was fine. She was never heard from again. Human remains found in the woods several miles away on April 27, 1998, were determined, through dental records, to be the remains of McGugin. A sweater found on the remains contained cuts consistent with stabbing and a piece of rope was found entwined in McGugin's hair. This evidence tended to show that McGugin's death was a homicide. DNA testing showed that the DNA from the remains matched DNA found in a bloodstain on the carpet in room 18 of Woody's Motel. This evidence tended to show that McGugin was taken from the motel room to the woods only after she had been injured, thus raising the reasonable inference that her movement was against her will, i.e., the result of kidnapping. The State also presented evidence indicating that McGugin's remains were not fully clothed when they were found. Although, as noted above, a sweater was found on the upper portion of the remains, a pair of *677 women's underwear and women's pants were found approximately 10 feet from the remains, thus suggesting that a rape had occurred. Finally, the State presented evidence indicating that the only personal property of McGugin found in the area where her remains were found was an earring; neither a purse nor the money McGugin was to have received for her services was found, and McGugin's car was found abandoned in the parking lot of the Drifter's Lounge on the causeway. This evidence tended to indicate that a robbery had occurred.
This circumstantial evidence was sufficient to allow the jury to reasonably infer that the crimes charged were, in fact, committed. As noted above, "`[t]he presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of the question to the jury.'" Maxwell, 828 So.2d at 357, quoting Watters v. State, 369 So.2d 1262, 1272 (Ala.Crim.App.1978), rev'd on other grounds, 369 So.2d 1272 (Ala.1979). Because the State sufficiently proved the corpus delicti of the capital offenses of murder during a kidnapping, murder during a rape, and murder during a robbery, independent of Lewis's confessions, his confessions were properly admitted. In addition, the evidence of the corpus delicti coupled with Lewis's confessions established a prima facie case of the capital offenses.

B.
Lewis also contends the evidence was insufficient to sustain his eight noncapital convictions because, he says, "the State did not establish a prima facie case against [him] independent of his confession." (Lewis's brief at p. 66.) Specifically, Lewis argues the following:
"In the instant case, if the evidence supplied by Mr. Lewis's confession is subtracted from the totality of the evidence supporting a guilty verdict in these two cases, there is insufficient remaining evidence to support a finding that the State had established a prima facie case of attempted kidnapping, rape, robbery, or murder against Mr. Lewis. All that remains in such an analysis is that Ashley Bitowf saw an unidentified man in the back-seat of her car, and that Stephanie Grayson was involved in a traffic accident with Mr. Lewis. Those facts, standing alone, are insufficient to establish a prima facie case of attempted rape, robbery, kidnapping, or murder in either case. Mr. Lewis's convictions in those cases, and life without parole sentences imposed as a result, are due to be reversed."
(Lewis's brief at p. 67.)
Again, although Lewis cites law regarding the State's burden of proving the corpus delicti of an offense independent of an accused's confession, specifically Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997), Lewis does not argue that the State failed to prove the corpus delicti of the noncapital offenses independent of his confessions or that the evidence as a whole (including his confessions) was insufficient to sustain the convictions for the noncapital offenses. Rather, Lewis's sole argument is that the State failed to prove a "prima facie case" of the noncapital charges independent of his confessions. As noted above, the State was not required to prove a prima facie case independent of his confessions; it was required only to prove the corpus delicti of the offenses. Therefore, Lewis's argument in this regard is meritless. Moreover, because plain-error review is not applicable to Lewis's noncapital convictions, see, e.g., Ex parte Woodall, 730 So.2d 652 (Ala.1998), on *678 remand, 730 So.2d 666 (Ala.Crim.App.1999), we are not required to address whether the State sufficiently proved the corpus delicti of the offenses independent of Lewis's confessions or whether the evidence as a whole was sufficient to sustain the convictions because those issues are not argued by Lewis on appeal. See, e.g., Burks v. State, 600 So.2d 374, 380 (Ala.Crim.App.1991), quoting United States v. Burroughs, 650 F.2d 595, 598 (5th Cir.), cert. denied, 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981) ("`[A]llegations... not expressly argued on ... appeal ... are deemed by us to be abandoned.'").

VI.
Lewis contends that the trial court erred in not instructing the jury on the offense of abuse of a corpse as a lesser-included offense of capital murder during a rape. (Issue VIII in Lewis's brief.) Citing Padgett v. State, 668 So.2d 78 (Ala.Crim.App.), cert. denied, 668 So.2d 88 (Ala.1995), Lewis argues that he was entitled to an instruction on abuse of a corpse because, he says, "[t]he evidence is unclear whether Misty McGugin was dying or was already dead at the time of the sexual act." (Lewis's brief at p. 59.)
The record reflects that, during the charge conference, Lewis did not request an instruction on the offense of abuse of a corpse as a lesser-included offense of capital murder during a rape, nor did he object to the trial court's not instructing on abuse of a corpse at the conclusion of the court's initial charge. However, the record reflects that after approximately three hours of deliberations, the jury sent the following question to the court: "For rape, does the person have to be alive?" (R. 2378.) The following discussion then took place between the court and counsel for both parties:
"[Prosecutor]: Your Honor, in my humble opinion, if it is a dead woman, it would be a necrophilia, which I believe is a misdemeanor, and I don't know what the Court  whether or not in the death penalty statute this would qualify as during the course  I think it's during the course of a rape the murder occurs. Am I not correct, gentlemen? What is the Court's opinion?
"THE COURT: My opinion is that I don't know, and I was hoping that somebody had a case that said one way or the other. My inclination is simply to recharge them on rape first, because I don't know.
"[Lewis's counsel]: I would agree with [the prosecutor]. That if the victim is deceased, that that simply is not what that act would be. Now, in the context of the other counts, I don't know how it would play there.
"[Prosecutor]: This is a question  Your Honor, this is a question of fact, which I would think that this jury would reasonably come in contact with. And although I don't know, my best guess is that a person would have to be alive to be raped.
"THE COURT: I'm going to take a look 
"[Lewis's cocounsel]: If the person is someone that's alive and if they're no longer alive then they're 
"[Prosecutor]: I believe we have a necrophilia statute.
"THE COURT: We do, and I'm looking at it. Well, it's called abuse of a corpse.
"....
"THE COURT: This is interesting. Somebody go pull this case for me. Go pull [Padgett v. State,] 668 So.2d 78 [(Ala.Crim.App.1995)]."
*679 (R. 2378-80.) After the court and counsel for both sides read and discussed Padgett, supra, the court gave the following supplemental instruction to the jury:
"All right. You may be seated. Ladies and gentlemen of the jury, you have submitted the following written question to the Court: For rape, does the person have to be alive? The obvious inference from this question is that this question is related to the case involving Misty McGugin, as she is the only deceased person involved in these cases.
"Ladies and gentlemen, in connection with this question, the issue for you is not when did the actual rape itself occur, but when was the intent to rape formed, relative to the time of death of the person. I want to give you some further instruction in that regard.
"If you believe and are convinced beyond a reasonable doubt, that by all of the evidence in the case that there was a murder of the intentional type and that a rape occurred as a series of events, then you would be entitled to convict the defendant, if you are convinced beyond a reasonable doubt that he is the one who did these acts. If, on the other hand, you are not convinced beyond a reasonable doubt that it is a series of events, but rather that it was an afterthought, that there was an intentional murder and then, as a mere and simple afterthought that the intercourse occurred, then you would not be authorized to convict the defendant of the crime of a capital offense.
"In other words, what I'm saying to you is that you must determine what was in the mind of the one who committed these acts and it must be proven to you beyond a reasonable doubt that it occurred.
"Now, even though you find that the defendant and are convinced beyond a reasonable doubt that the defendant had intercourse after the victim was unconscious, incapacitated, or even dead, if you find that and are convinced beyond a reasonable doubt that it occurred and that the intent was to do this as a series of events with no break in the action, then you would be authorized to find the defendant guilty. On the other hand, if you are not convinced beyond a reasonable doubt and you find that the defendant committed the act of intercourse as a mere afterthought sometime after the victim was dead, then you would not be authorized to convict the defendant of capital murder.
"Now, ladies and gentlemen of the jury, you should take this instruction, along with all of the other instructions I have given you in connection with the case, apply the law as I have instructed you to the facts as you determine them to be and then arrive at an appropriate verdict."
(R. 2385-87.) After the jury returned to deliberations, the following occurred:
"[Lewis's counsel]: We would base our objection, in part on the basis that the case  that the Court apparently relied on, [Padgett] v. State, ... 668 So.2d 78[(Ala.Crim.App.1995)]. In that case there was a finding that we could find no Alabama authority for this holding. However, courts in other jurisdictions have held that a corpse cannot be raped. And it cites several cases, I believe Pennsylvania and a Kentucky case. And the Kentucky case in parentheses, sexual intercourse with a dead body is not penalized as rape, but the offense is prohibited by the abuse-of-a-corpse statute and on that basis  that's the basis for our objection.
"THE COURT: Okay. It's not clear to me at all, having read the code section on abuse of a corpse that intercourse *680 with a corpse constitutes abuse of a corpse under Alabama law."
(R. 2388.) Although Lewis did not specifically state that his objection was to the court's not instructing on abuse of a corpse, the above-quoted exchange coupled with this Court's statements in Padgett makes it clear that the trial court understood Lewis's objection to be to its not charging the jury on abuse of a corpse as a lesser-included offense of murder during a rape.
The court's supplemental instructions to the jury in this case were identical to the instructions given in Padgett. In Padgett, this Court reversed the appellant's conviction for murder made capital because it was committed during the course of a rape on the ground that the State had withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Although reversing the appellant's conviction for a Brady violation, this Court addressed those issues that would likely arise on retrial, one of which was whether the trial court had erred in not instructing the jury on rape in the first degree as a lesser-included offense of capital murder. This Court stated:
"The appellant contends that in addition to instructing the jury on capital murder during a rape, the trial court also should have instructed the jury on the lesser included offense of rape. Failure to do so, the appellant says, constitutes reversible error.
"According to the record, the appellant did not request a charge for a lesser included offense of rape, nor was there an objection made at trial that such a charge was not given. In death penalty cases, failure to object does not preclude appellate courts from reviewing the issue under the plain error doctrine, but it does weigh against any claim of prejudice. Stewart v. State, 601 So.2d 491 (Ala.Crim.App.1992). The plain error doctrine is only to be used to correct particularly egregious errors in those circumstances in which a miscarriage of justice would result. Stewart, supra; Dill v. State, 600 So.2d 343, 351 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
"`A lesser included offense is generally defined as an offense the elements of which must necessarily be proven in order to convict for the specific higher offense.' Holladay v. State, 549 So.2d 122, 128 (Ala.Crim.App.1988) (quoting Ex parte Washington, 448 So.2d 404 (Ala.1984)). In this case, the appellant was indicted on a charge of murder during the commission of a rape. Because the elements of rape must be proven to convict the appellant of capital murder, rape would necessarily be a lesser-included offense. However, the appellant is only entitled to an instruction on a lesser-included offense if that offense is supported by a reasonable theory from the evidence. Holladay, supra at 129; Jones v. State, 514 So.2d 1060, 1063 (Ala.Crim.App.), cert. denied, 514 So.2d 1068 (Ala.1987). `A lesser-included offense charge should only be refused in a death case when the evidence adduced at trial could only support a conviction of the crime charged in the indictment.' Holladay, supra (emphasis in the original). Therefore this court must determine whether there is a reasonable theory from the evidence that would support a charge on the lesser-included offense of rape. See Holladay, supra at 130.
"Intentional murder becomes capital murder when the killing occurs during a rape. Section 13A-5-40, Code of Alabama 1975. `During' is defined in the Code as meaning `in the course of or in connection with the commission of, or in *681 immediate flight from the commission of the underlying felony or attempt thereof.' Section 13A-5-39(2), Code of Alabama 1975. An accused is not guilty of a capital offense where the intent to commit the accompanying felony, in this case rape, was formed only after the victim was killed. Connolly v. State, 500 So.2d 57, 62 (Ala.Crim.App.1985), aff'd, 500 So.2d 68 (Ala.1986). An accompanying felony committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction of capital murder; the question of the defendant's intent at the time of the commission of the crime is usually a jury question. See Smelley v. State, 564 So.2d 74, 86-87 (Ala.Crim.App.1990), cert. denied, Ex parte Green, 564 So.2d 89 (Ala.1990); Connolly, supra at 63.
"In his charge to the jury in this case, the trial judge instructed, `You may not find the defendant guilty of any offense other than the one charged in the indictment, that of capital murder, or of the lesser included offense, that of murder.' He also instructed the jury regarding whether a capital offense was committed:
"`If you believe and are convinced beyond reasonable doubt by all the evidence in the case that there was a murder of the intentional type and that a rape occurred as a series of events regardless of the time that it occurred, then you would be entitled to convict the defendant if you are convinced beyond a reasonable doubt that he is the one who did these acts. If on the other hand, you are not convinced beyond reasonable doubt that it is a series of events but rather that it was an afterthought, that there was an intentional murder and then as a mere and simple afterthought that the intercourse occurred, then you would not be authorized to convict the defendant of the crime of a capital offense. In other words, what I am saying is you must determine what was in the mind of the one who committed these acts and it must be proven to you beyond reasonable doubt that it occurred.
"`Now, even though you find that the defendant, and are convinced beyond a reasonable doubt, that the defendant had intercourse after the victim was unconscious, incapacitated, or even dead, if you find and are convinced beyond reasonable doubt that it occurred and the intent was to do this as a series of events with no break in the action, then you would be authorized to find the defendant guilty. On the other hand, if you are not convinced beyond reasonable doubt and you find that the defendant committed the act of intercourse as a mere afterthought, sometime after the victim was dead, then you would not be authorized to convict the defendant of capital murder, but only of the lesser included offense of murder.'
"The jury apparently considered carefully whether the rape occurred as an afterthought to the murder. According to the record, toward the end of its deliberations, the jury asked: `Does defendant have to have intent to commit rape while on the way to commit the murder or before the murder or can the intent come during the commission of the crime of murder or directly after? Which one is capital murder? What about afterthought? What is meant by that?'
"The evidence in this case is undisputed that Cathy Padgett was stabbed to death, and that someone had sexual intercourse with her either as she was dying or soon after her death. There is evidence that the sexual intercourse may *682 have occurred as long as 15 minutes after she died. If the jury believed that Cathy Padgett was still alive at the time of the sexual intercourse, then the murder would be in progress and the crime committed would meet the definition of murder during a rape, meaning the jury must convict the appellant of the capital offense. No charge on a lesser included offense of rape would be required. Similarly, if the jury found that the appellant formed the intent to rape the victim while he was killing her, and then had sex with her even though she was dead, he is still guilty of murder while committing the underlying offense, and the capital murder statute still applies. Thompson v. State, 615 So.2d 129 (Ala.Crim.App.1992); Hallford v. State, 548 So.2d 526, 534 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
"On the other hand, if, as the trial court instructed, the jury finds that the appellant did not have the intent to rape the victim at the time of the murder, and the sexual intercourse took place after her death, he could not be convicted of capital murder, only the lesser included offense of murder. In that case, because the victim was already dead when the appellant formed the intent to have sexual intercourse, instructing the jury on a lesser included offense of rape would be inapplicable.
"Rape, as charged in the appellant's indictment, is defined as sexual intercourse with a female by forcible compulsion. Section 13A-6-61(a)(1), Code of Alabama 1975. If the intent to have sexual intercourse arose after the victim was already dead, there could be no forcible compulsion of the victim to engage in sexual intercourse, thus, although the appellant's act was offensive and repugnant, it could not be rape. We could find no Alabama authority for this holding, however, courts in other jurisdictions have held that a corpse cannot be raped. See e.g., Commonwealth v. Sudler, 496 Pa. 295, 436 A.2d 1376 (1981) (the crime of rape only applies to indignities to the living); Smith v. Commonwealth, 722 S.W.2d 892 (Ky.1987) (sexual intercourse with a dead body is not penalized as rape, but the offense is prohibited by the abuse of a corpse statute). If the intent to have sexual intercourse arose after the victim's death, the crime committed would be abuse of a corpse, defined as knowingly treating `a human corpse in a way that would outrage ordinary family sensibilities.' Section 13A-11-13, Code of Alabama 1975.
"The appellant's theory of the case is that if he did not commit the crime of rape, then he cannot be convicted of capital murder as charged in the indictment, and he would not be subject to the death penalty. He is, in effect, using the crime of abuse of a corpse as a defense to capital murder. A defendant is entitled to have the trial court instruct the jury on his theory of defense, provided that the theory has legal foundation and is supported by the evidence. Lucero v. City of Birmingham, 592 So.2d 656 (Ala.Crim.App.1991); see also, Sanborn v. Commonwealth, 754 S.W.2d 534, 540-50 (Ky.1988). The appellant requested that the jury be instructed on abuse of a corpse, but the trial court refused to give such a charge. We hold that if on retrial the evidence supports the appellant's theory, he is entitled to an instruction on abuse of a corpse as a defense to capital murder.
"For the reasons set out above, on retrial the trial court should charge the jury on abuse of a corpse, however, the defendant is not entitled to have the *683 jury instructed on a lesser included offense of rape."
Padgett, 668 So.2d at 83-85.
Initially we point out that, as the Alabama Supreme Court recognized when it denied certiorari review, what this Court stated in Padgett regarding instructing the jury on abuse of a corpse was entirely dicta. See Ex parte Padgett, 668 So.2d 88, 89 (Ala.1995) ("In denying the petition, this Court does not address dicta in the Court of Criminal Appeals opinion suggesting that, under the circumstances of this case, it would be proper to instruct the jury regarding the offense of `abuse of corpse,' § 13A-11-13, Ala.Code 1975, as a lesser included offense of murder committed during the course of a rape."). Moreover, contrary to Lewis's contention, Padgett does not stand for the proposition that a defendant is automatically entitled to an instruction on abuse of a corpse as a lesser-included offense of capital murder during a rape whenever the evidence is "unclear" whether the victim was alive or dead at the time of the sexual act. Rather, Padgett merely recognizes that "[i]f the intent to have sexual intercourse arose after the victim's death, the crime committed would be abuse of a corpse," not capital murder during a rape. 668 So.2d at 85. However, that proposition, alone, is not determinative of the issue before us.
The trial court in this case was correct  the proper inquiry is not whether the sexual act occurred after the victim was dead, but whether the murder and the rape formed a continuous chain of events, i.e., whether the intent to commit the rape was formed before or during the murder. As this Court recognized in Padgett,"[a]n accused is not guilty of a capital offense where the intent to commit the accompanying felony, in this case rape, was formed only after the victim was killed," and "[a]n accompanying felony committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction of capital murder." Padgett, 668 So.2d at 83. However," `if an accused had the intent to commit the underlying offense at the time he murdered and the offense is committed immediately after the murder, he is guilty of murder while committing the underlying offense, and the capital murder statute still applies.'" Williams v. State, 795 So.2d 753, 773 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.), cert. denied, 534 U.S. 900, 122 S.Ct. 226, 151 L.Ed.2d 162 (2001), quoting Thompson v. State, 615 So.2d 129, 133 (Ala.Crim.App.1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993). We adhere to the view enunciated in Padgett that "[i]f the intent to have sexual intercourse arose after the victim was already dead, there could be no forcible compulsion of the victim to engage in sexual intercourse, thus, although the appellant's act was offensive and repugnant, it could not be rape." Padgett, 668 So.2d at 84. However, as the Alabama Supreme Court stated in Ex parte Roberts, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999), regarding a similar issue relating to capital murder during a robbery:
"This Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), that the fact that the victim was dead at the time the property was taken would not absolve a defendant of a charge of robbery if the intervening time between the murder and the taking of the property was such as to permit the jury to find that the murder and the taking were links in a continuous chain of events. See Thomas v. State, 460 So.2d 207 (Ala.Crim.App.1983), aff'd, 460 So.2d 216 (Ala.1984). To hold any other way `would be tantamount to granting to would-be robbers a license to kill their victims prior to [taking their property,] *684 in the hope of avoiding prosecution under the capital felony statute. 460 So.2d at 212."
735 So.2d at 1276-77. Moreover, in Hutcherson v. State, 677 So.2d 1174 (Ala.Crim.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996), on remand, 677 So.2d 1210 (Ala.Crim.App.1996), appeal after remand, 727 So.2d 846 (Ala.Crim.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999), this Court stated:
"The appellant next argues that there was insufficient evidence to show that he committed the murder during the course of committing a sodomy. Specifically, he argues that there was evidence that the victim was dead at the time she was sodomized and that there was no evidence that the appellant formed the intent to sodomize the victim before the victim was killed.
"Dr. Leroy Riddick, a forensic pathologist, testified that semen was found in the victim's rectum but that there was no evidence of trauma to the rectum. He testified that this could be either because of her age and the loss of elasticity in the area or because she was sodomized after her death.
"The appellant argues that on the basis of Dr. Riddick's testimony he could not be found guilty of sodomizing the victim and therefore could not be found guilty of the capital offense of murder committed during the course of sodomy under § 13A-5-40(a)(3), Code of Alabama 1975. We hold that the legislature did not intend such a result when it enacted § 13A-5-40(a)(3).
"Section 13A-5-40(a)(3) defines a capital murder as `murder by the defendant during a rape in the first or second degree or an attempt thereof committed by the defendant; or murder by the defendant during sodomy in the first or second degree or an attempt thereof committed by the defendant.' (Emphasis added.) `During' is defined in § 13A-5-39(2) as `in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof.'
"This court in Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), had occasion to determine whether a robbery that occurred after a murder could support a conviction for capital murder. Judge Patterson, writing for the court, stated:
"`The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing.... The intentional murder must occur during the course of a robbery in question; however, the taking of the property of the victim need not occur prior to the killing.... While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs.'
"548 So.2d at 534 (citations omitted).
"The reasoning of Hallford applies to this case. It makes no difference if the actual act of sodomy occurred after the victim's death.

"We agree with the Minnesota Supreme Court:
"`One who "[c]auses the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting the person or another,' is *685 guilty of murder in the first degree. Minn.Stat. § 609.185(2) (1990). In Minnesota the felony-murder rule applies whenever the felony and the homicide "are part of one continuous transaction." Bellcourt v. State, 390 N.W.2d 269, 274 (Minn.1986) [quoting Kochevar v. State, 281 N.W.2d 680, 686-87 n. 4 (Minn.1979)]. Thus, the felony-murder rule applies even though the underlying felony is completed after the homicide, provided the felony and homicide are parts of a single "continuous transaction." Compare State v. LaTourelle, 343 N.W.2d 277 (Minn.1984) (defendant convicted of first degree felony-murder where defendant intended to rape victim prior to the homicide but the rape took place after the homicide) with State v. Givens, 332 N.W.2d 187 (Minn.1983) (defendant acquitted of first degree felony-murder where defendant participated in murder of victim, then returned to murder scene a short time later to rape victim).
"`....'
"State v. Nielsen, 467 N.W.2d 615, 618 (Minn.1991)."
677 So.2d at 1194-95 (some emphasis in original; some emphasis added).
Contrary to Lewis's contention, he was not entitled to an instruction on the offense of abuse of a corpse as a lesser-included offense of capital murder during a rape merely because the evidence as to whether Misty McGugin was alive or dead at the time of the sexual act was inconclusive.
"`A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses.' MacEwan v. State, 701 So.2d 66, 69 (Ala.Crim.App.1997). `[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.' Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978). An accused has the right to have the jury charged on `any material hypothesis which the evidence in his favor tends to establish.' Ex parte Stork, 475 So.2d 623, 625 (Ala.1985). '"A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury."' Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App.1996), quoting Anderson v. State, 507 So.2d 580, 582-83 (Ala.Crim.App.1987).
"`"Whether a crime constitutes a lesser-included offense is to be determined on a case-by-case basis." Aucoin v. State, 548 So.2d 1053, 1057 (Ala.Crim.App.1989). "In determining whether one offense is a lesser included offense of the charged offense, the potential relationship of the two offenses must be considered not only in the abstract terms of the defining statutes but must also ... in light of the particular facts of each case." Ingram v. State, 570 So.2d 835, 837 (Ala.Crim.App.1990) (citing Ex parte Jordan, 486 So.2d 485, 488 (Ala.1986); emphasis in original). See also Farmer v. State, 565 So.2d 1238 (Ala.Crim.App.1990).'
"Ford v. State, 612 So.2d 1317, 1318 (Ala.Crim.App.1992)."
McNabb v. State, 887 So.2d 929, 973-74 (Ala.Crim.App.2001).
*686 Although we agree that abuse of a corpse may be a lesser-included offense of capital murder during a rape in certain circumstances  i.e., where the intent to rape was formed only after the murder and the rape was an afterthought unrelated to the murder  those circumstances are not present in this case. Lewis did not argue at trial, and he does not argue on appeal, that the rape was a mere afterthought to the murder, i.e., that he did not form the intent to commit the rape until after McGugin was already dead, and there is no reasonable theory from which the jury could have concluded from the evidence that Lewis did not form the intent to rape until after McGugin was dead. The evidence is clear that the kidnapping, robbery, rape, and murder of Misty McGugin were part of one continuous transaction that began when Lewis first grabbed McGugin and began strangling her in room 18 of Woody's Motel and culminated in Lewis's having sexual intercourse with McGugin in the woods and leaving her there. Therefore, we find no error on the part of the trial court in not instructing the jury on the offense of abuse of a corpse as a lesser-included offense of capital murder during a rape.
We note that Lewis also contends that when giving its supplemental instruction to the jury, the trial court erred in not also reinstructing the jury on the lesser-included offenses of intentional murder, felony murder, and manslaughter. He maintains that by not reinstructing the jury that it could consider the lesser-included offenses if it found that the State had failed to prove beyond a reasonable doubt the elements of capital murder during a rape the trial court "placed undue influence on the finding of guilt of capital murder or on the alternative not guilty verdict" and thus created the risk that the jury would "limit [its] deliberations to a determination of guilt or innocence of capital murder only, without deliberating the lesser-included offenses." (Lewis's brief at p. 64.) Because Lewis did not object to the trial court's not reinstructing the jury on the lesser-included offenses, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
"A `trial judge is not required to repeat any other part of his oral charge when answering a specific inquiry from the jury, and it is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge.'" Whitley v. State, 607 So.2d 354, 358-59 (Ala.Crim.App.1992), quoting Fountain v. State, 586 So.2d 277, 281 (Ala.Crim.App.1991), opinion extended after remand, 598 So.2d 1026 (Ala.Crim.App.1992).
"`"When a jury requests additional instructions the recommended practice is for the trial court to remain within the area of the specific request in making his response. East v. State, 339 So.2d 1104, 1106-07 (Ala.Cr.App.1976). A trial judge is not required to repeat any other part of his oral charge when answering a specific inquiry from the jury. White v. State, 195 Ala. 681, 686, 71 So. 452 (1916); Thomas v. State, 393 So.2d 504, 508 (Ala.Cr.App.1981). It is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge. Turner v. State, 160 Ala. 40, 47, 49 So. 828 (1909)."
"`Davis v. State, 440 So.2d 1191, 1195 (Ala.Cr.App.1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984). See also Deutcsh v. State, 610 So.2d 1212, 1217-18 (Ala.Cr.App.1992).'
"Miller v. State, 645 So.2d 363, 365 (Ala.Crim.App.1994)."
*687 Clemons v. State, 720 So.2d 961, 984 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). Here, in its supplemental instruction, the trial court specifically reminded the jury that it should consider the supplemental instruction, along with all of the other instructions that had been given previously. The supplemental instruction did not place "undue influence" on the capital charge and there is no indication that the jury did not consider the previous instructions regarding the lesser-included offenses. Therefore, we find no error, much less plain error, in the trial court not reinstructing the jury on the lesser-included offenses.

VII.
Lewis contends that "the jury verdict forms ... relating to the capital murder indictment did not comport with the instructions given by the trial court to the jury." (Issue IX in Lewis's brief at p. 64.) Specifically, Lewis argues that the verdict forms gave the jury the option of finding him guilty of kidnapping in the first degree, rape in the first degree, and robbery in the first degree, as lesser-included offenses of the capital-murder charges, but that "[a] close review of the court's oral charge to the jury reveals that the trial court never instructed the jury ... that these offenses were lesser-included offenses of capital murder as charged in the indictment." (Lewis's brief at p. 64.) Lewis maintains that by giving the jury verdict forms that conflicted with the trial court's instructions, the trial court violated his "right to a fair, impartial, and reliable determination of guilt or innocence." (Lewis's brief at p. 65.) Because Lewis did not object to the verdict forms, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
The record reflects that, during the charge conference, the trial court indicated that it was going to instruct the jury on kidnapping in the first degree, rape in the first degree, and robbery in the first degree as lesser-included offenses of the three capital-murder charges. However, after thoroughly reviewing the court's oral charge, we conclude that the court did not give those instructions. The court first charged the jury on the elements of the three capital charges; it then charged on the elements of the lesser-included offenses of intentional murder, felony murder, and manslaughter. During the felony-murder instruction, instead of instructing the jury on the elements of kidnapping, rape, and robbery as they applied to felony murder, the court stated:
"Ladies and gentlemen, a little later in this charge I'm going to charge you specifically with regard to the crimes of robbery in the first degree, rape in the first degree, and kidnapping in the first degree. And I would ask that you consider those elements of those felonies in connection with this charge concerning felony murder."
(R. 2352.) Later in the charge, when the court instructed the jury on the noncapital charges of attempted murder, attempted kidnapping, attempted rape, and robbery, the court stated:
"Now, ladies and gentlemen, I am going to ask that in connection with these felony offenses you recall these and insert these into the earlier instructions that I gave you with regard to felony murder as possible alternative felonies that might be applicable as elements in that charge."
(R. 2357.) The trial court never instructed the jury that it could consider kidnapping in the first degree, rape in the first degree, and robbery in the first degree as lesser-included offenses of the three capital *688 charges (outside of their application to the lesser-included offense of felony murder).
Although clearly the verdict forms given to a jury should be consistent with the trial court's instructions to that jury, after thoroughly reviewing the record in this case, we do not believe that the inconsistency between the trial court's jury instructions and the verdict forms prejudiced Lewis or denied Lewis a fair trial. The verdict forms gave the jury the option of finding Lewis guilty of the lesser-included offenses of kidnapping, rape, and robbery, and the elements of those offenses were clearly defined for the jury during the court's oral charge. Although the court inadvertently failed to specifically instruct the jury that it could consider those as lesser-included offenses of the capital-murder charges, as it had indicated during the charge conference that it would, any error in the verdict forms referring to lesser-included offenses that were not discussed in the court's oral charge was, at most, harmless error and certainly did not rise to the level of plain error.
Moreover, although Lewis does not contend that the trial court's failure to instruct the jury on the lesser-included offenses of kidnapping in the first degree, rape in the first degree, and robbery in the first degree, was error, we point out that "[t]he failure to charge on a lesser-included offense may, in some circumstances, be harmless error." McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2001). In this case, any error in this regard was harmless because the jury was charged on the lesser-included offenses of intentional murder, felony murder, and manslaughter, and the jury found Lewis guilty of the greater capital offenses. See, e.g., Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___ (Ala.Crim.App.2001) (the trial court's failure to charge the jury on reckless murder and felony murder was, at most, harmless error, where the jury was charged on capital murder, intentional murder, reckless manslaughter, and heat-of-passion manslaughter, and the jury found the defendant guilty of capital murder); Smith v. State, 756 So.2d 892 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.), cert. denied, 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000) (the trial court's failure to charge the jury on reckless manslaughter was not error but, even if it was, it was harmless error, where the jury was charged on capital murder, intentional murder, and robbery and the jury found the defendant guilty of capital murder); and Brown v. State, 623 So.2d 416 (Ala.Crim.App.1993) (the trial court's failure to charge the jury on lesser-included offenses was, at most, harmless error, where the jury was charged on capital murder and felony murder and the jury found the defendant guilty of capital murder).

VIII.
Lewis contends that Alabama's method of execution constitutes cruel and unusual punishment. (Issue XII in Lewis's brief.) Specifically, he argues that "[t]he procedures, equipment, personnel, and other circumstances surrounding execution by electrocution in Alabama present punishment which is qualitatively more cruel and unusual than any civilized society should tolerate." (Lewis's brief at p. 71.)
Recently, the Alabama Legislature amended § 15-18-82, Ala.Code 1975, which provides for the time, place, and method of executions in Alabama, and added § 15-18-82.1, Ala.Code 1975. Section 15-18-82.1(a) provides:
"A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution. The sentence shall be executed pursuant to Section 15-18-82."
*689 Section 15-18-82(a), as newly amended, now reads:
"Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law. If electrocution is held unconstitutional, the method of execution shall be lethal injection."
These sections became effective July 1, 2002, and they apply to all inmates currently on death row. Because the primary method of execution in Alabama has been changed from electrocution to lethal injection, Lewis's argument is moot. See Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002); Tomlin v. State, [Ms. CR-98-2126, May 31, 2002] ___ So.2d ___ (Ala.Crim.App.2002); Harrison v. State, 869 So.2d 509 (Ala.Crim.App.2002); and Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002).

IX.
Lewis contends that the trial court's jury instructions during the sentencing phase of the trial were improper because, he says, the court "incorrectly instructed the jury on what it had to find before it could return a verdict of life without parole instead of death." (Issue XI in Lewis's brief at p. 67.) Specifically, he argues that the court's instructions on how to weigh the aggravating circumstances and the mitigating circumstances "flatly contradict[ed] the statutory language... on the absolute requirement that the jury shall return a life verdict unless it finds that the aggravating circumstances outweigh the mitigating circumstances." (Lewis's brief at pp. 67-68.) Because Lewis did not object to the court's charge, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
The trial court charged the jury, in pertinent part, as follows:
"The law of this State provides that the punishment for the capital offense for which you have convicted this defendant, is either death by electrocution or life imprisonment without eligibility for parole....
"The law also provides that whether death or life imprisonment without parole should be imposed upon the defendant depends upon whether any aggravating circumstances exist and, if so, whether the aggravating circumstances outweigh the mitigating circumstances.
"....
"If the jury is not convinced beyond a reasonable doubt based upon the evidence that one or more such aggravating circumstances exist, then the jury must recommend that the defendant's punishment be life imprisonment without parole, regardless of whether there are any mitigating circumstances in the case.
"....
"If you should find that no aggravating circumstance has been proven beyond a reasonable doubt to exist in this case, then you must return a verdict recommending that the defendant's punishment be life imprisonment without the possibility of parole....
"....
"The process of weighing aggravating and mitigating circumstances against each other in order to determine the proper punishment is not a mechanical process. Your weighing of the circumstances against each other should not consist of merely adding up the number of aggravating circumstances and comparing *690 that number to the total number of mitigating circumstances.
"The law of this state recognizes that it is possible in at least some situations that one or a few aggravating circumstances might outweigh a larger number of mitigating circumstances. The law of this state also recognizes that it is possible, at least in some situations, that a large number of aggravating circumstance might be outweighed by one or a few mitigating circumstances....
"....
"Now, ladies and gentlemen, if after a full and fair consideration of all of the evidence in this case you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and that the aggravating circumstance or circumstances outweighs the mitigating circumstances, your verdict would be: `We, the jury, recommend that the defendant, Gerrald Patrick Lewis, be punished by death.' ...
"However, if after a full and fair consideration of all of the evidence in this case you determine that the mitigating circumstances outweigh any aggravating circumstances that exist or you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict would be to recommend punishment of life imprisonment without parole...."
(R. 2427-28.)(Portion of instruction complained of by Lewis emphasized.)
Initially, we note that these instructions are materially identical to those in the Alabama Proposed Pattern Jury Instructions for Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178."A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).
Moreover, the Alabama Supreme Court and this Court have upheld instructions virtually identical to the instructions given in this case against similar challenges. See Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997); McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2003)(opinion on rehearing); Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001); Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); and Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989).
In addressing this same issue in McNabb, this Court stated:
"The trial court's instructions in this case did not contain the egregious improprieties that the instructions in Ex parte Bryant, [[Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala.2002),] did, and we conclude that this case is controlled by Ex parte Trawick, 698 So.2d 162 (Ala.1997), which the Supreme Court distinguished in Ex parte Bryant. We have reviewed the record in Ex parte Trawick, and we find that the instructions that were specifically approved by the Supreme Court in that case, and that were reaffirmed by the Supreme Court in Ex parte Bryant, are materially identical to the instructions given in this case. Based on the Supreme Court's opinion in Ex parte Trawick upholding identical instructions, we find no plain error in the instructions in this case; taken as a whole, the instructions *691 in this case did not improperly suggest to the jury `that the death penalty [was] appropriate even if the aggravating circumstances [did] not outweigh the mitigating circumstances so long as the mitigating circumstances [did] not outweigh the aggravating circumstances.' Ex parte Bryant, ___ So.2d at ___."
887 So.2d at 997 (footnote omitted).
Similarly, after reviewing the trial court's sentencing-phase instructions in their entirety, we find that this case is also controlled by Ex parte Trawick. Because the instructions given in this case were the same as the instructions the Supreme Court upheld in Ex parte Trawick, we find no plain error as to this claim.

X.
Lewis contends that the trial court erred in not considering his history of mental illness in mitigation, in not finding the existence of the statutory mitigating circumstance that the offense was committed while he was under the influence of extreme mental or emotional disturbance, and in not finding that his history of mental illness was a nonstatutory mitigating circumstance. (Issue VII in Lewis's brief.)
"`In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process.'
"Ex parte Hart, 612 So.2d 536, 542 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). `"While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."' Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd, 625 So.2d 1146 (Ala.1993). `Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.' Harrell v. State, 470 So.2d 1303, 1308 (Ala.Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
"`"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala. *692 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Crim.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."'
"Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App.1999), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The fact that the trial court does not list and make findings in its sentencing order as to each alleged nonstatutory mitigating circumstance offered by a defendant indicates that the trial court found some of the offered evidence not to be mitigating, not that the trial court did not consider this evidence. See, e.g., Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999)."
Reeves v. State, 807 So.2d 18, 47-48 (Ala.Crim.App.2000), cert. denied 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001).
Initially, we note that Lewis offered no evidence of mitigating circumstances during the sentencing phase of the trial or the sentencing hearing before the trial court. He specifically instructed his attorneys not to make an opening statement or a closing argument to the jury during the sentencing phase of the trial; not to present any evidence in mitigation; and not to make any argument to the trial court during the sentencing hearing before the court. Nevertheless, despite the fact that no evidence was offered and no argument was made, it is clear from its sentencing order that the trial court considered all of the evidence that had been presented throughout the trial in determining whether any mitigating circumstances existed. Regarding the statutory mitigating circumstances that the offense was committed while Lewis was under the influence of extreme mental or emotional disturbance and that Lewis's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, the court specifically stated that it had considered the "great deal of evidence" that had been presented regarding Lewis's history of mental illness. (C. 14.) In addition, although the trial court did not find any nonstatutory mitigating circumstances to exist under § 13A-5-52, Ala.Code 1975, it indicated in its order that it had considered "all of the evidence presented during all stages of the trial in this cause, as well as the Court's observation and evidence admitted during all proceedings, pretrial and posttrial." (C. 14.) Based on its sentencing order, it is clear that the trial court fully complied with Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in that it considered all evidence that could possibly have been considered mitigating.
Lewis also contends that the trial court erred in not finding the existence of *693 the statutory mitigating circumstance that the offenses were committed while Lewis was under the influence of extreme mental or emotional disturbance and in not finding that his history of mental illness was a nonstatutory mitigating circumstance. In this regard, Lewis specifically argues that, in finding that his history of mental illness was neither a statutory nor nonstatutory mitigating circumstance, the trial court improperly applied the standard for insanity, specifically noting in its order that Lewis was aware of the wrongfulness of his actions and that he exercised his own volition in committing the crimes.
In its sentencing order, the trial court made the following findings:
"Mitigating circumstance number two is the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. The trial of this case at all of its stages has contained evidence of alleged mental illness on the part of the defendant. And certainly, at some points in the defendant's life the defendant has had certain mental illnesses; however, based upon the totality of the evidence presented during the trial of this case, the Court does not find that the capital offenses were committed while the defendant was under the influence of extreme mental or emotional disturbance. The Court finds specifically that he was aware of what he was doing, aware of the wrongness of his acts, could fully appreciate the criminality thereof, and nevertheless proceeded to commit those acts."
(C. 13.) Contrary to Lewis's contention, merely because the court found that Lewis was aware of the wrongfulness of his actions and the criminality of his conduct does not mean that the court applied the standard of legal insanity to the mitigating evidence. See, e.g., Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002) (holding that the trial court's statement in its sentencing order that Ferguson was not "insane" did not show that the trial court applied the standard of insanity to Ferguson's proffered evidence of mitigation).
After reviewing the record and the trial court's sentencing order, we conclude that the trial court did not apply the standard of insanity when considering whether Lewis's history of mental illness constituted statutory and/or nonstatutory mitigation. The trial court merely found that the evidence of Lewis's history of mental illness  which was at best weak and conflicting  was unpersuasive. The trial court's findings are supported by the evidence.
Two experts testified that Lewis was faking his symptoms of mental illness, one of whom, Dr. Boyer, who testified during the competency trial, was Lewis's own witness. In addition, Lewis's expert during the guilt phase of the trial, Dr. Baxter, testified that she could not give a definitive opinion as to Lewis's mental state at the time of the crimes. As this Court stated in Ferguson:
"`The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict.' Wesley v. State, 575 So.2d 108, 121 (Ala.Crim.App.1989), rev'd on other grounds, 575 So.2d 127 (Ala.1990). Moreover,
"`"[w]e fully recognize that `[a] factfinder is not bound by expert testimony "even if all of the witnesses are presented by only one side."' Ellis v. State, 570 So.2d 744, 752 (Ala.Cr.App.1990). `In Alabama, opinion testimony of an expert witness is binding upon a jury *694 only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted.' Jefferson County v. Sulzby, 468 So.2d 112, 116 (Ala.1985). `An expert's opinion, however, is not conclusive on the trial court, even though uncontroverted. See Kroger Co. v. Millsap, 280 Ala. 531, 196 So.2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues.' Williams v. City of Northport, 557 So.2d 1272, 1273 (Ala.Civ.App.1989), cert. denied, 498 U.S. 822, 111 S.Ct. 71, 112 L.Ed.2d 45 (1990). `Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.' Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985)."'
"Perkins v. State, 808 So.2d 1041, 1137 (Ala.Crim.App.1999), quoting Carroll v. State, 599 So.2d 1253, 1272 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994)."
814 So.2d at 963-64. We find no error in the trial court finding that Lewis's history of mental illness was not a statutory or nonstatutory mitigating circumstance.

XI.
After this case was argued and submitted, the United States Supreme Court released Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We subsequently directed the parties to file supplemental briefs addressing the impact of Atkins and Ring on Lewis's sentence of death. We address those arguments in turn.

A.
In Atkins v. Virginia, the United States Supreme Court held that the execution of mentally retarded individuals constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The Court did not define mental retardation for purposes of determining whether a defendant could be sentenced to death, but instead left "`to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.'" Atkins, 536 U.S. at 317, 122 S.Ct. 2242, quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).
After the Atkins decision, the United States Supreme Court remanded Perkins v. Alabama, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), to the Alabama Supreme Court for that Court to address the impact of Atkins on Perkins's sentence of death in light of evidence in the record indicating that Perkins had an IQ of 76. In addressing the impact of Atkins in Ex parte Perkins, 851 So.2d 453 (Ala.2002), the Alabama Supreme Court first noted that the issue was reviewable only under the plain-error rule because it had been raised for the first time on remand from the United States Supreme Court. The Alabama Supreme Court went on to say:
"The standard applicable to plain-error review is a stringent one, i.e., the `error has or probably has adversely affected the substantial right of the appellant,' Rule 45A, Ala.R.App.P. Applying that standard, we reject Perkins's contention that in light of the holding in Atkins, we must remand this cause for *695 the trial court to conduct a hearing to determine if he is mentally retarded and therefore not subject to the death penalty.
"We have conducted a thorough review of the record to determine if there is any inference that Perkins is mentally retarded. Although the Legislature has not had an occasion to address this State's policy on this matter and establish a procedure for determining whether a capital defendant is mentally retarded and therefore not subject to the death penalty, we conclude that Perkins does not suffer from mental retardation under the definitions considered by the United States Supreme Court in reaching its holding in Atkins or as defined by any of the state statutes that prohibit the imposition of the death sentence on a mentally retarded defendant.
"We agree with the State that this Court can determine, based on the facts presented at Perkins's trial, that Perkins, even under the broadest definition of mental retardation, is not mentally retarded. Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).
"The record establishes that Dr. John Goff, a licensed clinical neuropsychologist and clinical psychologist, testified on Perkins's behalf. According to Dr. Goff, Perkins, when tested as an adult, has a full-score IQ of 76, with a verbal score of 80 and a performance score of 74. Dr. Goff stated that Perkins's IQ scores indicate a borderline range of psychometric intelligence, and that his intellectual functioning has probably declined as he has aged because of his abuse of alcohol. Moreover, the record indicates that Perkins earned a GED certificate while he has been in prison and has completed community college courses there. Dr. Goff diagnosed Perkins with a borderline personality disorder and an alcohol dependence; he did not conclude that Perkins was mentally retarded. We find Dr. Goff's diagnosis pivotal in light of the fact that, when the penalty phase of Perkins's trial was conducted, Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and its progeny were applicable, and evidence of mental retardation established a strong mitigating circumstance to be considered in determining the appropriate sentence.
"Additionally, the evidence presented at trial indicates that Perkins did not exhibit `significant' or `substantial' deficits in adaptive behavior before or after age 18. Perkins was able to have interpersonal relationships. Indeed, he was married for 10 years. He maintained a job as an electrician for a short period. Perkins did not present any evidence during the penalty phase of his trial to establish that he was mentally retarded. The record does not create any inference that Perkins is mentally retarded. Because Perkins cannot establish the common requirements for mental retardation, we reject Perkins's contention that we must remand this cause for resentencing.
"The Virginia Supreme Court in Emmett v. Commonwealth, 264 Va. 364, 569 S.E.2d 39 (2002), confronted a factual situation similar to the one this Court confronts here. The Court affirmed Emmett's sentence of death, noting:

*696 "`The United States Supreme Court in Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002), recently held that the execution of mentally retarded persons violates the Eighth Amendment's prohibition against cruel and unusual punishments. The Court did not establish an express standard for determining when an individual would be considered mentally retarded and left to the States the task of developing appropriate ways to enforce this constitutional restriction upon executions. Atkins, 536 U.S. at 317, 122 S.Ct. at 2250. The General Assembly has not had the opportunity to address this matter following the decision in Atkins.

"`At trial, Emmett did not assert that he is mentally retarded. Moreover, our review of the record reveals nothing that even suggests that he is mentally retarded. Emmett received a high school equivalency diploma, attended a community college, and was regularly employed during his adult life prior to committing the murder in question. Accordingly, we conclude that Emmett does not suffer from any mental retardation that would constitutionally restrict the imposition of the death sentence in this case.'
"264 Va. at 376 n. 2, 569 S.E.2d at 47 n. 2.
"Applying the plain-error standard of review, we hold that because, applying the most common definitions of mental retardation, we find no indication in the record that Perkins is mentally retarded, no reversible error occurred and the imposition of the death sentence in this case is not unconstitutional."
Ex parte Perkins, 851 So.2d at 455-57 (footnotes omitted).
In Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003), the Alabama Supreme Court again had occasion to address the impact of Atkins on a death sentence. The Court again found it unnecessary to remand for an evidentiary hearing, holding that no plain error had occurred because "[b]ased on the facts presented at Smith's trial, under even the broadest definition of mental retardation Smith is not mentally retarded." Ex parte Smith, ___ So.2d at ___. The Court recognized, as it had in Ex parte Perkins, that
"[t]hose states that have statutes prohibiting the execution of a mentally retarded defendant require that to be considered mentally retarded a defendant must have significantly subaverage intellectual functioning (an IQ score of 70 or below) and significant or substantial deficits in adaptive behavior. Additionally, those problems must have manifested themselves before the defendant reached age 18."
Ex parte Smith, ___ So.2d at ___. See also § 15-24-2(3), Ala.Code 1975 (a part of the "Retarded Defendant Act," § 15-24-1 et seq., Ala.Code 1975, defining a mentally retarded person for purposes of placement before trial as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments").
In his supplemental brief, Lewis argues that there is some evidence in the record indicating that he is mentally retarded and that, therefore, his death sentence violates the Eighth Amendment. He argues that this Court should either hold as a matter of law that he is mentally retarded and vacate his death sentence or remand this case for an evidentiary hearing *697 on the issue of his mental retardation. Based our review of the record, however, we conclude that Lewis's sentence of death is not in violation of the Eighth Amendment and that no evidentiary hearing on the matter is necessary.
First, we have found little evidence in the record indicating that Lewis's intellectual functioning is significantly subaverage. As Lewis points out, the record contains a report by Dr. C. Van Rosen, who was appointed by the Mobile Circuit Court to evaluate Lewis's competency to stand trial on the Mobile County murder charge; that report indicates that Lewis had a full-scale IQ of 58 in 1998, when he was 33 years old, placing him in the mildly mentally retarded range.[20] However, with respect to those test results, Dr. Van Rosen stated the following in his report:
"The [Wide Range Achievement Test-III] reading subtest was also administered, showing quite limited effort on the part of the defendant and a reading score within the elementary school level. Finally, an individually administered intelligence test [Wechsler Adult Intelligence Scale  Revised] was given to Mr. Lewis. His obtained results showed a Verbal IQ of 57 (.2 percentile), a Performance IQ of 63 (1st percentile), and a Full Scale IQ of 58 (.2 percentile). These scores would technically place him within the moderately retarded range of abilities, well below his other observed abilities and life history. His efforts were obviously poor and his scores on this test were markedly at variance with his behavior and the clinical impression of average intellectual abilities. In essence, the first day's testing was quite consistent with the clinical impression of efforts by Mr. Lewis at portraying himself as more disturbed than was the actual case.
"On the second visit, the defendant seemed somewhat more cooperative and was administered the remainder of the academic screening measure [Wide Range Achievement Test-III].... Here again, the defendant made a quite limited effort. The WRAT-3 showed other skills (spelling and arithmetic) improbably low.

"....
"... Scores on academic and intellectual skills were well below the abilities demonstrated in face to face conversation, as well as inconsistent with his known history."
(C. 476-77.)(Emphasis added.) In contrast to the evaluation conducted by Dr. Van Rosen in 1998, the record contains evidence indicating that when Lewis was incarcerated in Georgia in the mid-1990s, he was administered the Wide Range Achievement Test-Revised, and that he scored a 109 on that test, placing him in the average range of intelligence. The test results also indicated that Lewis had a 12th grade reading level. Dr. Boyer, Lewis's own expert, testified at the competency trial that Lewis was not mentally retarded, but rather, based on the test results from Georgia, that his intellectual functioning was, in fact, a "little above average." (R. 1151.)
In Ex parte Smith, supra, the record indicated that Smith had a full-scale IQ of 66 when he was 12 years old and a full-scale IQ of 72 when he was 26 years old. The Alabama Supreme Court nevertheless found it unnecessary to remand the case for an evidentiary hearing on Smith's mental retardation; it stated:

*698 "The testimony with regard to Smith's intellectual functioning indicates that he falls within the borderline to mildly mentally retarded range with an overall IQ score of 72 a year after the murders, which seriously undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions."
___ So.2d at ___.
Similarly, here, the bulk of evidence regarding Lewis's intellectual functioning indicates that he does not have significantly subaverage intellectually functioning. Lewis scored a 109 on an intelligence test in the mid-1990s, placing him in the average range of intelligence, and his own expert testified that he was not mentally retarded, but that his intellectual functioning was actually above average. Although in 1998 Lewis's IQ was reported as 58, the psychologist who administered that test stated that he believed that the test score "was markedly at variance with his behavior and the clinical impression of average intellectual abilities." (C. 476.) As in Ex parte Smith, the testimony and evidence indicating that Lewis has above average intelligence "seriously undermines" any conclusion that he suffers from significantly subaverage intellectual functioning. ___ So.2d at ___.
Second, the record indicates no deficits in Lewis's adaptive behavior. The record indicates that Lewis dropped out of high school in either the 9th or 10th grade, but that he received a GED certificate and had even completed "some college." (C. 463.) Lewis was married for a short period and apparently he and his wife had a child, although it appears that he never saw the child after the child was born. The record also indicates that Lewis held various jobs throughout his adult life, including working as a mechanic. Although the record indicates that Lewis had poor grades in school, was in "special classes" for most of his education, and had behavioral problems beginning at age three, it appears that his childhood problems were not related to his intellectual functioning, but, rather, were precursors to his subsequent diagnosis of personality disorder with delusional features. In addition, there is nothing in the record indicating that Lewis had a history of mental retardation, and Lewis did not make his IQ an issue at trial or present any evidence during either the guilt phase or the sentencing phase of the trial indicating that he was mentally retarded. Furthermore, the nature and circumstances surrounding the crimes in this case  including Lewis's articulate and detailed statement to the police  suggest goal-directed behavior, thus indicating that Lewis does not suffer from deficits in adaptive behavior.
Finally, "because the evidence does not support [Lewis's] contention that he manifested subaverage intellectual functioning and significant deficits in adaptive behavior, we need not address the third factor  whether those problems evinced themselves before [Lewis] was 18 years old." Ex parte Smith, ___ So.2d at ___.
Based on the record before us, it is clear that Lewis does not meet even the most liberal definition of mental retardation. Therefore, we conclude that Lewis's sentence of death is not in violation of the Eighth Amendment and that no evidentiary hearing on the matter is necessary.

B.
In his supplemental brief, Lewis makes several arguments regarding the impact of Ring v. Arizona, which, he says, requires that his death sentence be vacated and that he be resentenced to life imprisonment without the possibility of parole.
*699 After the parties filed their supplemental briefs, the Alabama Supreme Court issued its decisions in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), and Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003), both of which are applicable to the present case. In addition, this Court has issued numerous opinions addressing various claims with respect to Ring. See Moody v. State, 888 So.2d 532 (Ala.Crim.App.2003); Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002)(opinion on return to remand); Stallworth v. State, 868 So.2d 1128, 1178 (Ala.Crim.App.2001)(opinion on return to second remand); Harrison v. State, 869 So.2d 509, 526 (Ala.Crim.App.2003)(opinion on rehearing); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002); and Tomlin v. State, [Ms. CR-98-2126, November 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002)(opinion on rehearing). All of Lewis's arguments with respect to Ring have been addressed and decided adversely to him either by this Court or by the Alabama Supreme Court.
In Moody, this Court stated:
"In Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002),] the United States Supreme Court overruled Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), to the extent that it allowed the judge, not the jury, to find an aggravating circumstance that supported a death sentence and decided that its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applied to Arizona's death-penalty scheme. See Ring, 536 U.S. at 589, 122 S.Ct. at 2432 (`Capital defendants, no less than non-capital defendants... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.'). Apprendi had announced the rule that `[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.' Apprendi, 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added); see also Ring, 536 U.S. at 601-02, 122 S.Ct. at 2439.
"Under Alabama law, at least one aggravating circumstance under § 13A-5-49, Ala.Code 1975, must exist in order for a defendant convicted of a capital offense to be eligible for a sentence of death. Ex parte Waldrop, 859 So.2d 1181, 1187 (Ala.2002), citing § 13A-5-45(f), Ala.Code 1975 (providing that when a defendant has been convicted of a capital offense, `[u]nless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole')....
"....
"In Stallworth [v. State,] 868 So.2d 1128, 1178 (Ala.Crim.App.2003)(opinion on second return to remand)], this court found that while the Supreme Court in Ring extended Apprendi to death-penalty cases, it did not purport to alter the express exemption in Apprendi for the fact of a prior conviction, which the Supreme Court had earlier recognized in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). We stated:
"`[O]ne of the aggravating circumstances in this case related to a prior conviction  that the capital offense was committed by a person under sentence of imprisonment. See § 13A-5-49(1), Ala.Code 1975. The Apprendi Court specifically excluded from its holding prior convictions. The Apprendi Court stated, "Other than the *700 fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. The Court left untouched its holding in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), that an increase in a sentence related to recidivism is left to the trial court. As the Maryland Court of Appeals recognized after Apprendi:

"`"The rule that prior convictions do not have to be proven to a jury beyond a reasonable doubt was first recognized in Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). There, the Supreme Court emphasized that questions related to recidivism have traditionally been decided by the sentencing court rather than the jury. Justice Breyer, delivering the opinion of the Court, wrote:
"`"`First, the sentencing factor at issue here  recidivism  is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence. Consistent with this tradition, the Court said long ago that a State need not allege a defendant's prior conviction in the indictment or information which alleges the elements of an underlying crime, even though the conviction was necessary to bring the case within the statute. That conclusion follow[s]... from the distinct nature of the issue, and the fact that recidivism does not relate to the commission of the offense, but goes to the punishment only, and therefore ... may be subsequently decided.'
"`"Id. at 243, 118 S.Ct. at 1230-31, 140 L.Ed.2d 350 (emphasis in original) (internal quotation marks and citations omitted) [in Stewart].
"`"In Apprendi, the Court emphasized that it was not overruling Almendarez-Torres. Apprendi, 530 U.S. at 489, 120 S.Ct. at 2362, 147 L.Ed.2d 435. In fact, the Court reiterated that recidivism is a traditional grounds for a sentencing court's increasing an offender's sentence, and that recidivism does not relate to the commission of the offense. Id. at 488, 120 S.Ct. at 2361-62, 147 L.Ed.2d 435 (quoting Jones v. United States, 526 U.S. 227, 248-49, 119 S.Ct. 1215, 1227, 143 L.Ed.2d 311 (1999)).
"`"....
"`"In United States v. Santiago, 268 F.3d 151 (2nd Cir.2001), the trial judge sentenced the defendant pursuant to a statute that required that the defendant have three prior convictions arising from offenses committed on different occasions. The defendant argued that the `prior conviction' exception does not encompass the question whether prior convictions arose from offenses committed on different occasions. The United States Court of Appeals for the Second Circuit rejected the defendant's argument, reasoning as follows:
"`"`In short, we read Apprendi as leaving to the judge, consistent with due process, the task of finding not only the mere fact of previous convictions but other related issues as well. Judges frequently must make factual determinations for sentencing, so it is hardly anomalous to require that they also determine the "who, what, when, and where" of a prior conviction.'
"`"Id. at 156.

*701 "`"Santiago reflects the general rule that the Almendarez-Torres exception covers questions related to recidivism, not merely the fact of prior conviction. Appellee's previous term of incarceration, like prior convictions arising from crimes committed on separate occasions, Santiago, 268 F.3d at 156, or the aggravated nature of a prior conviction, [U.S. v.] Becerra-Garcia, 28 Fed.Appx. 381, at 385... [(6th Cir.2002)], is a fact related to recidivism, and, as stated above, recidivism is a question that traditionally has been reserved for the sentencing court."
"`State v. Stewart, 368 Md. 26, 39-41, 791 A.2d 143, 151-52 (2002). We agree with the rationale and holding of the Stewart court. Whether at the time of the murders Stallworth was under a sentence of imprisonment because he was on probation for his prior conviction for assault in the third degree was a question related to Stallworth's prior conviction  a question for the trial court to resolve. Therefore, this aggravating circumstance was not subject to the holdings in Apprendi and Ring.'
"Stallworth, 868 So.2d at 1184-85.
"Recently, in Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala.2003), the Alabama Supreme Court recognized that Ring did not alter the exemption for the fact of a prior conviction; our supreme court stated:
"`In his special writing in Bottoson v. Moore, 833 So.2d 693, 719 (Fla.2002), Justice Pariente eloquently explained:
"`"[T]he presence of a prior violent felony conviction meets the threshold requirement of Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] as extended to capital sentencing by Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)]. In Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the United States Supreme Court approved an enhanced sentence for the crime of returning to the United States after being deported, based on the judge's finding that the deportation was pursuant to three prior convictions of aggravated felonies. The Court rejected a claim that the enhancement was improper because the indictment had not alleged that the deportation was pursuant to the prior convictions. As explained in Apprendi, `our conclusion in Almendarez-Torres turned heavily upon the fact that the additional sentence to which defendant was subject was "the prior commission of a serious crime."' 530 U.S. at 488, 120 S.Ct. 2348 [147 L.Ed.2d 435]. In Apprendi, the Court held:
"`"`[T]here is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.'
"`"Id. at 496, 120 S.Ct. 2348 [147 L.Ed.2d 435]. Accordingly, the Court held: `Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' Id. at 490, 120 S.Ct. 2348 [147 L.Ed.2d 435] (emphasis supplied [in Bottoson]).

*702 "`"In extending Apprendi to capital sentencing, the Court in Ring did not eliminate the `prior conviction' exception arising in Almendarez-Torres. The Court noted in Ring that `[n]o aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres.' 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4."
"`833 So.2d at 722-23 (footnote omitted). As was the circumstance in Bottoson, one of the aggravating circumstances presented by the State in the penalty phase of this trial involved a prior felony conviction; therefore, Smith is not entitled to relief pursuant to Ring. See Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).
"Ex parte Smith, ___ So.2d at ___.
"In this case, one of the aggravating circumstances found by the trial court was that Moody had been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975. The trial court's finding was based on Moody's prior convictions in federal court.... Because it was a finding of fact related to recidivism, the trial court's finding, as an aggravating circumstance, that Moody had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, this aggravating circumstance was not subject to the holdings in Apprendi and Ring. Upon the trial court's making this finding, Moody became eligible for a sentence of death."
888 So.2d at 597-600 (footnotes omitted).
Similarly, two of the aggravating circumstances the trial court found to exist in this case were that the murder occurred while Lewis was under a sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975, and that Lewis had previously been convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975. The trial court's findings were based on Lewis's felony convictions in Georgia, for which he was on parole at the time of the murder, and his conviction in Massachusetts for assault with intent to murder. The trial court's findings in this regard were not subject to the holding in Ring and were alone sufficient to make Lewis eligible for the death penalty.
Moreover, even if the trial court had not found any aggravating circumstances relating to recidivism, Lewis's death sentence would still be valid under Ring because the existence of the aggravating circumstance that the capital offense was committed while Lewis was engaged in the commission of a rape, robbery, and kidnapping, see § 13A-5-49(4), Ala.Code 1975, was proven beyond a reasonable doubt by virtue of the jury's guilt-phase verdicts finding Lewis guilty of capital murder during a rape, capital murder during a robbery, and capital murder during a kidnapping.
In Ex parte Waldrop, the Alabama Supreme Court stated:
"It is true that under Alabama law at least one statutory aggravating circumstance under Ala.Code 1975, § 13A-4-49, must exist in order for a defendant convicted of a capital offense to be sentenced to death. See Ala.Code 1975, § 13A-5-45(f)(`Unless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole.'); Johnson v. State, 823 So.2d 1, 52 (Ala.Crim.App.2001)(holding that in order to sentence a capital defendant to death, the sentencer `"must determine the existence of at least one of the aggravating *703 circumstances listed in [Ala.Code 1975,] § 13A-5-49"' (quoting Ex parte Woodard, 631 So.2d 1065, 1070 (Ala.Crim.App.2001 [1993]))). Many capital offenses listed in Ala.Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49:
"`For example, the capital offenses of intentional murder during a rape, § 13A-5-40(a)(3), intentional murder during a robbery, § 13A-5-40(a)(2), intentional murder during a burglary, § 13A-5-40(a)(4), and intentional murder during a kidnapping, § 13A-5-40(a)(1), parallel the aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged ... [in a] rape, robbery, burglary or kidnapping," § 13A-5-49(4).'
"Ex parte Woodard, 631 So.2d at 1070-71 (alterations and omission in original).
"Furthermore, when a defendant is found guilty of a capital offense, `any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.' Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (`The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'). This is known as `double-counting' or `overlap,' and Alabama courts `have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.' Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App.1992).
"Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was `proven beyond a reasonable doubt.' Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Waldrop's case, the jury, and not the trial judge, determined the existence of the `aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require."
859 So.2d at 1187-88.
In this case, as in Ex parte Waldrop, the jury's guilt-phase verdicts necessarily included a finding of the aggravating circumstance that the capital offense was committed while Lewis was engaged in the commission of a rape, robbery, and kidnapping. This guilt-phase finding by the jury, just like the trial court's finding regarding Lewis's prior convictions, was, alone, sufficient to expose Lewis to a range of punishment that had as its maximum the death penalty.
Finally, in Ex parte Waldrop, the Supreme Court went on to explain:
"Waldrop also claims that Ring and Apprendi require that the jury, and not the trial court, determine whether the *704 aggravating circumstances outweigh the mitigating circumstances....
"Contrary to Waldrop's argument, the weighing process is not a factual determination. In fact, the relative `weight' of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, `While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.' Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which `the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.' Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See Harris v. Alabama, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)(rejecting `the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required"' (quoting Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that `the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer').
"Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)(`Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.'); Zant v. Stephens, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (`sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does').
"In Ford v. Strickland, supra, the defendant claimed that `the crime of capital murder in Florida includes the element of mitigating circumstances not outweighing aggravating circumstances and that the capital sentencing proceeding in Florida involves new findings of fact significantly affecting punishment.' Ford, 696 F.2d at 817. The United States Court of Appeals for the Eleventh Circuit rejected this argument, holding that `aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer's discretion in a structured way after guilt has been fixed.' 696 F.2d at 818. Furthermore, in addressing the defendant's claim that the State must prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, the court stated that the defendant's argument
"`seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact *705 susceptible to proof under a reasonable doubt or preponderance standard, see State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. [1950], 40 L.Ed.2d 295 (1974), and State v. Johnson, 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party.'
"696 F.2d at 818. Alabama courts have adopted the Eleventh Circuit's rationale. See Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990)( `while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party'); see also Melson v. State, 775 So.2d 857, 900-901 (Ala.Crim.App.1999); Morrison v. State, 500 So.2d 36, 45 (Ala.Crim.App.1985).
"Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.
"....
"Waldrop claims that the trial court's determination that the murders were especially heinous, atrocious, or cruel as compared to other capital offenses  an aggravating circumstance under Ala.Code 1975, § 13A-5-49(8)  is a factual determination that under Ring must be made by the jury. However, Ring and Apprendi do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in `an increase in a defendant's authorized punishment ...' or `"expose[ ] [a defendant] to a greater punishment...."' Ring, 536 U.S. at 602, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggravating circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became `exposed' to, or eligible for, the death penalty. The trial court's subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we held earlier is not an `element' of the offense."
859 So.2d at 1188-90 (footnote omitted).
Because Lewis was eligible for the death penalty based on the jury's guilt-phase verdict and on the trial court's findings regarding his prior convictions, the trial court's findings of additional aggravating circumstances  that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, and that the murder was one of a series of intentional killings committed by Lewis  were factors that had application only in the process of weighing the aggravating and the mitigating circumstances, a process that is not a factual finding within the purview of Ring and Apprendi.
Finally, contrary to Lewis's contention, the decision in Ring does not invalidate Alabama's scheme of vesting the ultimate sentencing authority in the trial court, with the jury relegated to an advisory *706 role, and it does not require that the jury's advisory verdict be unanimous before it can recommend death. See Duke, Turner, and Tomlin, supra. The procedure by which Lewis was sentenced to death fully complied with the United States Supreme Court's decision in Ring and, thus, Lewis's sentence of death is proper.

XII.
Finally, Lewis contends that the cumulative effect of all of the alleged errors during his trial warrants reversal of his convictions. (Issue XIII in Lewis's brief.) However, after thoroughly reviewing the record, we conclude that the cumulative effect of any errors that occurred during Lewis's trial does not warrant reversal of his convictions.

XIII.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Lewis's capital-murder convictions, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the competency proceedings or in the proceedings during the guilt phase of the trial.
We have also reviewed Lewis's sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Lewis's capital murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Lewis of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating circumstances (Lewis presented no evidence of mitigating circumstances); after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury, by a vote of 10-2, recommended a sentence of death.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Lewis to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, *707 and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975.
In its findings, the trial court found the existence of five statutory aggravating circumstances: (1) that the murder was committed while Lewis was under a sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975; (2) that Lewis had been previously convicted of another capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975; (3) that the murder was committed while Lewis was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, rape, robbery, and kidnapping, see § 13A-5-49(4), Ala.Code 1975; (4) that the murder was especially heinous, atrocious, or cruel as compared to other capital murders, see § 13A-5-49(8), Ala.Code 1975; and (5) that the murder was one of a series of intentional killings committed by Lewis, see § 13A-5-49(10), Ala.Code 1975. The trial court found no statutory or nonstatutory mitigating circumstances to exist.
We note that, although the trial court included findings regarding aggravating and mitigating circumstances in its sentencing order, it failed to include in its order written findings of fact summarizing the offense and Lewis's participation in it. Section 13A-5-47(d) requires that the trial court include in its sentencing order "written findings of facts summarizing the crime and the defendant's participation in it." Although the trial court interspersed factual findings throughout its sentencing order, specifically with respect to its findings as to the aggravating and mitigating circumstances, those findings, which are, at best, brief, are not sufficient to satisfy the requirement in § 13A-5-47(d) that the trial court enter written findings of fact summarizing the offense and the defendant's participation in it.
This Court has, on numerous occasions, remanded cases for the trial court to enter specific written findings of fact. See, e.g., Clark v. State, [Ms. CR-99-1062, December 1, 2000] ___ So.2d ___ (Ala.Crim.App.2000); Merrill v. State, 741 So.2d 1099 (Ala.Crim.App.1997); Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998); and Nelson v. State, 681 So.2d 252 (Ala.Crim.App.1995), aff'd on return to remand, 681 So.2d 257 (Ala.Crim.App.), aff'd, 681 So.2d 260 (Ala.1996). However, a remand is not possible in this case because the trial judge who sentenced Lewis is no longer a circuit court judge.[21] Recently, the Alabama Supreme Court addressed a similar issue and concluded that a remand, although necessary to comply with the statute, was not mandated where the judge who had presided over the trial and sentenced the defendant to death was no longer on the bench. In Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the trial court's sentencing order was deficient because it failed to specify what consideration the court gave to the jury's recommendation of life imprisonment without the possibility of parole in determining to override that recommendation and impose a sentence of death, as is required by §§ 13A-5-47(d) and (e), Ala.Code 1975. See Ex parte Taylor, 808 So.2d 1215 (Ala.2001), cert. denied 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002). The Supreme Court held that, although under normal circumstances a remand would be necessary in such a situation, a remand was not required in that case. The Court stated:

*708 "A remand to the trial court is not an option in this case, however, because the trial judge, Judge Dale Segrest, is no longer on the bench. Instead, the case would be assigned to a circuit judge who is unfamiliar with the case and who cannot possibly supply Judge Segrest's `specific reasons for giving the jury's recommendation the consideration [Judge Segrest] gave it.' [Ex parte Taylor,] 808 So.2d [1215,] 1219 [(Ala.2001)]. Because a remand is not possible, and in order to ensure that the death penalty in this case was not imposed in an arbitrary and capricious manner, this Court must perform its own review of the propriety of the death sentence and determine whether the aggravating circumstances outweigh the mitigating circumstances."
Ex parte Waldrop, 859 So.2d at 1191-92 (footnote omitted).
Although this case is not an override situation, Ex parte Waldrop is nevertheless instructive. It is the findings of fact summarizing the offense and the defendant's participation in it that supplies this Court with the sentencer's motivation for imposing the death sentence. As in Ex parte Waldrop, however, a trial judge who is unfamiliar with the case is not in a position to supply the facts that motivated the sentencing judge to impose a sentence of death. Under these circumstances, and in order to ensure that the death penalty in this case was not imposed in an arbitrary and capricious manner, this Court will proceed to perform its own review of the propriety of the death sentence and determine whether the aggravating circumstances outweigh the mitigating circumstances. Ex parte Waldrop, 859 So.2d at 1190.
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of the State's counsel (Lewis's counsel presented no argument), the presentence report, and the advisory verdict of the jury, and after weighing the aggravating circumstances against the lack of mitigating circumstances in the case, it determined that death was the appropriate sentence and sentenced Lewis to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the sentencing phase of the proceedings.
Lewis was convicted of murder during a kidnapping, robbery, and rape. Those offenses are defined by statute as capital offenses. See §§ 13A-5-40(a)(1), (a)(2), and (a)(3), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., cases dealing with murders committed during a kidnapping: Smith v. State, 838 So.2d 413 (Ala.Crim.App.), cert. denied, 537 U.S. 1090, 123 S.Ct. 695, 154 L.Ed.2d 635 (2002); Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___ (Ala.Crim.App.2001); Smith v. State, 797 So.2d 503 (Ala.Crim.App.2000), cert. denied, 797 So.2d 549 (Ala.), cert. denied, 534 U.S. 962, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001); Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002); Duncan v. State, 827 So.2d 838 (Ala.Crim.App.1999), aff'd, 827 So.2d 861 (Ala.2001), cert. denied, 537 U.S. 860, 123 S.Ct. 237, 154 L.Ed.2d 99 (2002); Loggins v. State, 771 So.2d 1070 (Ala.Crim.App.1999), aff'd, 771 So.2d 1093 (Ala.2000); cases dealing with murders committed during a robbery: Hodges v. State, 856 So.2d 875, 894 (Ala.Crim.App.2001)(opinion on return to remand), aff'd, 856 So.2d 936 (Ala.2003); Waldrop v. State, 859 So.2d 1138, 1152 (Ala.Crim.App.2000)(opinion on return to *709 remand), aff'd, 859 So.2d 1181 (Ala.2002); Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001); Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002); Maxwell v. State, 828 So.2d 347 (Ala.Crim.App.2000), cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002); Clemons v. State, 720 So.2d 961 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); and cases dealing with murders committed during a rape: Ray v. State, 809 So.2d 875 (Ala.Crim.App.2001), cert. denied, 809 So.2d 891 (Ala.2001), cert. denied, 534 U.S. 1142, 122 S.Ct. 1096, 151 L.Ed.2d 993 (2002); Williams v. State, 795 So.2d 753 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.), cert. denied, 534 U.S. 900, 122 S.Ct. 226, 151 L.Ed.2d 162 (2001); Powell v. State, 796 So.2d 404 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.), cert. denied, 534 U.S. 904, 122 S.Ct. 236, 151 L.Ed.2d 170 (2001); Hammonds v. State, 777 So.2d 750 (Ala.Crim.App.1999), aff'd, 777 So.2d 777 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); Slaton v. State, 680 So.2d 877 (Ala.Crim.App.1993), on return to remand, 680 So.2d 879 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996).
After carefully reviewing the record of the guilt phase and the sentencing phase of Lewis's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the lack of mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the lack of any mitigating circumstances, and that death is the appropriate sentence in this case. Considering the crime committed, and Lewis, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
We note, however, that our review of the record reveals that the sentences imposed for the two attempted-kidnapping convictions  life imprisonment without the possibility of parole  exceed the maximum authorized by law. "Matters concerning unauthorized sentences are jurisdictional," Hunt v. State, 659 So.2d 998, 999 (Ala.Crim.App.1994), and we may take notice of an illegal sentence even though Lewis did not raise the issue in the trial court or in his brief on appeal. See, e.g., Pender v. State, 740 So.2d 482 (Ala.Crim.App.1999). Kidnapping in the first degree is a Class A felony, see § 13A-6-43(c), Ala.Code 1975. Section 13A-4-2(d)(2), Ala.Code 1975, provides that an attempt to commit a Class A felony is a Class B felony. The record of the sentencing hearing before the trial court reflects that Lewis was sentenced as a habitual offender with four prior felony convictions. At the time Lewis was convicted and sentenced, § 13A-5-9, Ala.Code 1975,[22] provided, in part:
"(c) In all cases when it is shown that a criminal defendant has been previously convicted of any three felonies and after *710 such convictions has committed another felony, he must be punished as follows:
"....
"(2) On conviction of a Class B felony, he must be punished for life in the penitentiary."
Lewis's sentences of life imprisonment without the possibility of parole for the two attempted-kidnapping convictions exceed the maximum authorized by law and are, therefore, void. See, e.g., Ferguson v. State, 565 So.2d 1172, 1173 (Ala.Crim.App.1990) ("When the court imposes sentence in excess of that authorized by statute, it exceeds its jurisdiction, and the sentence is consequently void.").
Based on the foregoing, we affirm Lewis's convictions for three counts of capital murder and his sentence of death. We likewise affirm his eight noncapital convictions, and the sentences imposed for six of those convictions  the two attempted-murder convictions, the two attempted-rape convictions, and the two robbery convictions. However, we remand this case to the trial court with directions for that court to resentence Lewis on his attempted-kidnapping convictions. Due return should be filed with this Court no later than 56 days from the date of this opinion.
AFFIRMED IN PART AND REMANDED WITH DIRECTIONS.[*]
McMILLAN, P.J., and WISE, J., concur. COBB, J., concurs in part and dissents in part, with opinion. BASCHAB, J., recuses herself.
COBB, Judge, concurring in part and dissenting in part.
I concur with nearly all of the issues in this thoroughly researched and well-written opinion. The opinion fully addresses and resolves many concerns I had when I originally reviewed the briefs in this case and following oral argument before this Court. My sole remaining concern is Issue VI, regarding the trial court's failure to instruct the jury on the offense of abuse of a corpse as a lesser-included offense of capital murder during a rape.
The majority holds that Lewis was not entitled to a jury charge on the offense of abuse of a corpse because there was no reasonable theory of the evidence from which the jury could have concluded that only after Misty died did Lewis form the intent to have sexual intercourse with her in the woods. I disagree.
As the majority notes, after approximately three hours of deliberation, the jury presented the trial court with a question, "For rape, does the person have to be alive?" (R. 2378.) This indicates, in my opinion, that the jury believed that Misty died before Lewis had sexual intercourse with her in the woods or, at a minimum, that the jury was aware that the evidence was unclear whether Misty was alive when Lewis had sexual intercourse with her in the woods. The evidence could support the inference that Misty was dead before Lewis had sexual intercourse with her in the woods.
In his second confession, Lewis stated that while he was driving Misty's car into the woods, he heard her coughing in the backseat. He stopped the car, got out, and tightened the rope he had previously tied around her neck until she stopped coughing. Lewis then drove further into the woods. The forensic pathologist testified at trial that strangulation could cause *711 death within 3 to 10 minutes, but only if pressure were applied to the neck continuously. After Lewis stopped in the woods, he removed Misty's body from her car and had intercourse with her again. He then dragged her further into the woods and left her. Lewis said that he believed Misty was dead when he left her because her face was turning purple and her body was cold.
The majority contends that the rape was part of a continuous transaction and that Lewis formed the intent to rape before Misty died. While I agree that this is one theory that can be formed from the evidence, I believe that an equally plausible theory is that Misty died in her car after Lewis tightened the rope around her neck and that, after he removed her body from the car, Lewis made the decision to have sexual intercourse with a woman he knew to be dead. The fact that Misty's body was cold and that her face was purple when Lewis left her in the woods suggests that she did not die immediately before he left her, but that she had died sometime previously.
Thus, the jury could have concluded that Misty was dead when Lewis had sexual intercourse with her in the woods, and the jury's question regarding whether rape required a live victim further supports this possibility. Because the evidence supported that reasonable theory of the case, the trial court should have charged the jury on the lesser-included offense of abuse of a corpse.
Although the jury should have been instructed on the lesser-included offense, all the convictions and sentences in the entire case need not be reversed. The convictions and sentences for murder during the course of a kidnapping and murder during the course of a robbery are due to be affirmed. In an abundance of caution and in order to preclude a reversal in later proceedings, I believe the better course of action would be to set aside the conviction and sentence for the charge of murder made capital because it was committed during the course of a rape.
For the foregoing reasons, I concur in part and dissent in part.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] In his statement, Lewis also confessed to murdering two women in Atlanta, Georgia. The trial court ruled that evidence of those crimes was inadmissible, and that portion of the tape in which Lewis discussed those murders was redacted before the tape was played for the jury.
[3] The State presented evidence showing that Lewis had been arrested for driving under the influence of alcohol on January 18, 1998.
[4] Although Lewis took investigators to the areas where he said he had thrown the purse and the knife, neither the purse nor the knife were recovered.
[5] In his second statement, Lewis again confessed to murdering two women in Georgia, and that portion of the statement was edited out of the tape before it was played for the jury.
[6] Again, Lewis identified McGugin only as "Misty" and stated that he knew her name only because he had seen it on her driver's license.
[7] Lewis lived with his mother; he stated that he went into the attic because he did not want to wake his mother.
[8] Lewis said in both of his statements that the ponytail holder was pink.
[9] In addition to being evaluated by Dr. Smith and Dr. Baxter, Lewis had been evaluated by Dr. Katherine Boyer to determine his competency to stand trial in the present case and by Dr. Van Rosen to determine his competency to stand trial on the murder charge in Mobile County.
[10] The record reflects that Lena had brown hair, just as did all of the victims. In his statement to police, Lewis indicated that he picked his victims because their brown hair reminded him of Lena.
[11] These records were introduced into evidence at the competency trial.
[12] This is apparently a reference to Charles Graddick, who at one time was the attorney general for Alabama and also served as district attorney in both Mobile County and Montgomery County.
[13] This explanation is based entirely on the testimony regarding DNA analysis presented at Lewis's trial.
[14] With mtDNA, the "control" region is the region containing the most differences between people so that region is targeted for analysis. The control region is divided into two "hypervariable regions," which, together, contain approximately 610 base pairs. (R. 1409.)
[15] Lewis does not contend that the evidence was not relevant and it is clear from the record that the evidence was, in fact, relevant because it linked Lewis to McGugin's vehicle.
[16] Lewis is Caucasian.
[17] She did not state what the result of that examination was.
[18] Again, Lewis does not challenge the relevance of this evidence and it is clear from the record that the evidence was relevant as it linked the remains found in the woods to room 18 of Woody's motel, thus corroborating Lewis's confessions.
[19] Isenberg testified that there was a margin of error with the population-frequency-statistical evidence which is incorporated into the analysis. She stated that her estimate that the DNA sequence in the hair and bloodstained carpet would occur in approximately 0.2 percent of the Caucasian population included that margin of error and was, therefore, a conservative estimate. According to Isenberg, her calculations without the margin of error indicated that the DNA would occur in only 0.1 percent of the population.
[20] Although this report was not introduced into evidence, it is included in the record before this Court and, therefore, is subject to this Court's plain-error review.
[21] We take judicial notice that the trial judge in this case, Lynn Stuart, is now a Justice on the Alabama Supreme Court.
[22] Section 13A-5-9, Ala.Code 1975, was amended effective May 25, 2000.
[*] Note from the reporter of decisions: On October 24, 2003, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On november 14, 2003, that court denied rehearing, without opinion. On April 30, 2004, the Supreme Court denied certiorari review, without opinion (1030298).